ARMSTRONG BROS. TOOL CO.; Bergman Tool Manufacturing Co., Inc.; Duro Metal Products Company; Milwaukee Tool & Equipment Co., Inc.; Proto Tools Division, Ingersoll Rand Company; Warren Tool Corporation; Wilton Tool Division of Wilton Corporation; and Woodings-Verona Tool Works, Plaintiffs,

v.

UNITED STATES (Great Neck Saw Manufacturing, Incorporated, Party-In-Interest), Defendant.

C.D. 4848; Court No. 77-8-02004.

United States Customs Court.

March 27, 1980.

Frederick L. Ikenson, Washington, D. C., for plaintiffs.

Alice Daniel, Asst. Atty. Gen., Washington, D. C., David M. Cohen, Director, Commercial Litigation Branch, Joseph I. Liebman, New York City, Attorney in Charge, for Customs Litigation, and Sidney N. Weiss, Trial Attorney, New York City, for defendant.

NEWMAN, Judge:

## INTRODUCTION

This is an American manufacturers' action brought pursuant to 28 U.S.C. § 1582(b) (1976), 28 U.S.C. § 2632(a) (1976) and 19 U.S.C. § 1516(c) (1976), involving the Antidumping Act of 1921, as amended (19 U.S.C. §§ 160, et seq. (1970)) (Antidumping Act).

Plaintiffs, domestic manufacturers and/or wholesalers of certain nonpowered hand tools (viz., chisels, punches, hammers and sledges, vises, c-clamps and battery service tools), contest the negative injury determination of the United States International Trade Commission ("Commission") in Investigation No. AA1921–149 (40 FR 57517 (1975) and the action of the Department of the Treasury ("Treasury") in amending its determination of sales at less than fair value ("LTFV") (40 FR 49111 (1975)). Great Neck Saw Manufacturing, Incorporated, made a party in interest pursuant to 19 U.S.C. § 1516(c) (1976),[1] is the consignee in New York seaport entry No. 77–471887 of July 20, 1977, and the importer of hand tools falling within the class or kind of merchandise involved in this action imported without assessment of antidumping duties.

This action is presently before me on plaintiffs' motion and the Government's cross-motion for summary judgment. After careful consideration of the voluminous administrative record and the comprehensive memoranda of law submitted by counsel, I have concluded that no genuine triable issue of fact is presented in this case, and that defendant is entitled to summary judgment dismissing this action.

## BACKGROUND

The highlights of the administrative history of this action are undisputed, and may be briefly summarized:

1. On September 5, 1974 an Antidumping Proceeding Notice issued by Treasury was published in the *Federal Register* (39 FR 32159), advising that an investigation was being instituted to determine whether certain nonpowered hand tools from Japan, including chisels, punches, hammers and sledges, vises, c-clamps, and battery service tools, were being or were likely to be sold at LTFV.

2. On June 5, 1975 a Withholding of Appraisement Notice was issued by Treasury and published in the *Federal Register* (40 FR 24218). Included among the hand tools covered were chisels, punches, hammers and sledges (with or without handles), vises, c-clamps, and battery service tools, other than specific hand and battery service tools, from certain Japanese sources. In the notice, battery service tools were stated to include "battery terminal lifters, battery post and terminal cleaning brushes, battery terminal spreaders, angle-nose pliers, booster cables and battery service kits (terminal puller, cleaning brush and two terminals)".

3. On September 5, 1975 a Determination of Sales at LTFV covering "Certain Non-Powered Hand Tools from Japan" was issued by Treasury and published in the *Federal Register* (40 FR 41155). Included among the hand tools covered were chisels,

---

1. Under 19 U.S.C. § 1516(f) (1976), the consignee or his agent has the right to appear and be heard as a party in interest in an action brought by an American manufacturer pursuant to section 1516. In the present case, however, the party in interest, Great Neck Saw Manufacturing, Incorporated, did not file any papers in connection with the present cross-motions.

punches, hammers and sledges (with or without handles), vises, c-clamps, and battery service tools, other than specific hand and battery service tools, from certain Japanese sources. The term "battery service tools", was defined in the same manner as it was in the Withholding of Appraisement Notice.

4. Thereafter, on September 10, 1975 the Commission instituted Investigation No. AA1921–149 for the purpose of determining whether an industry in the United States was being or was likely to be injured, or prevented from being established, by reason of sales at LTFV. On September 15, 1975 the Commission published in the *Federal Register* its notice of investigation and public hearing (to be held on October 2, 1975) and included in such notice the same definition of battery service tools used by Treasury in its Withholding of Appraisement Notice and its Determination of Sales at LTFV (40 FR 42607). A notice rescheduling the hearing from October 2 to October 22, 1975 was published by the Commission in the *Federal Register* on September 24, 1975 (40 FR 43956). The hearing was held on October 22 and 23, 1975.

5. On October 21, 1975 Treasury published in the *Federal Register* an Amendment of Determination of Sales at LTFV by eliminating from the scope of its original determination all battery service tools other than battery terminal lifters (40 FR 49111).

6. The Commission, on October 23, 1975 (second day of the hearing), amended the scope of its investigation to make it correspond with the new advice received from Treasury, and on October 29, 1975 published in the *Federal Register* notice of the amendment of the investigation (40 FR 50320).

7. The Commission unanimously reached a negative decision (viz., it determined that an industry in the United States is not being or is not likely to be injured, or is not prevented from being established, by reason of the sales at LTFV). The decision together with a Statement of Reasons was published in the *Federal Register* on December 10, 1975 (40 FR 57517). In arriving at its determination, the Commission gave due consideration to written submissions from interested parties, evidence adduced at the hearing, and all factual information obtained by the Commission's staff from questionnaires, personal interviews, and other sources.

No question has been raised concerning plaintiffs' compliance with the administrative prerequisites to the initiation of a civil action prescribed by 19 U.S.C. § 1516(a) and (c).

Pursuant to plaintiffs' motion and over defendant's objection, I entered an order that the Secretary of the Commission prepare and transmit to the Clerk of the Court, on or before September 25, 1978, the following: (1) a certified copy of the transcript of proceedings and exhibits introduced before the Commission in Investigation No. AA1921–149; (2) certified copies of all written submissions, questionnaires, reports, and all other documents relating to Investigation No. AA1921–149; and (3) all other things in the files of the Commission relating to the investigation.[2]

Pursuant to the foregoing order, as modified, the Secretary of the Commission transmitted what are represented to be all of the documents and things enumerated and described above that were locatable,[3]

---

2. This was an unpublished order entered on July 26, 1978. In a similar published order entered in a companion case, it was stated that the order was to enable the Court to determine whether the Commission's finding of injury was "among other things, arbitrary, an abuse of discretion, or otherwise contrary to law". *Armstrong Bros. Tool Co. et al. v. United States, etc.*, 453 F.Supp. 889, 80 Cust.Ct. 252, C.R.D. 78–5 (1978). The July 26, 1978 order in the instant case was modified by a stipulation

for a protective order entered on August 28, 1978.

3. These documents and things, comprising the massive administrative record, are listed on two numbered indexes, which were also transmitted to the Court, entitled "List No. 1 Public Documents Transmitted to the United States Customs Court", and "List No. 2 Confidential Documents Transmitted to the United States Customs Court". Public documents are identified on List No. 1, while those documents

with the exception of the one document which was claimed by the Commission Chairman to be privileged.[4]

## STATUTES INVOLVED

The statutory provisions relevant to this action are:

Section 201, Antidumping Act of 1921, as amended, 19 U.S.C. § 160 (1970):

Initiation of investigation; injury determination; findings; withholding appraisement; publication in Federal Register.

(a) Whenever the Secretary of the Treasury (hereinafter called the "Secretary") determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States or elsewhere at less than its fair value, he shall so advise the United States Tariff Commission, and the said Commission shall determine within three months thereafter whether an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation of such merchandise into the United States. The said Commission, after such investigation as it deems necessary, shall notify the Secretary of its determination, and, if that determination is in the affirmative, the Secretary shall make public a notice (hereinafter in sections 160 to 171 of this title called a "finding") of his determination and the determination of the said Commission. For the purposes of this subsection, the said Commission shall be deemed to have made an affirmative determination if the Commissioners of the said Commission voting are evenly divided as to whether its determination should be in the affirmative or in the negative. The Secretary's finding shall include a description of the class or kind of merchandise to which it applies in such detail as he shall deem necessary for the guidance of customs officers.

(b) Whenever, in the case of any imported merchandise of a class or kind as to which the Secretary has not so made public a finding, the Secretary has reason to believe or suspect, from the invoice or other papers or from information presented to him or to any person to whom authority under this section has been delegated, that the purchase price is less, or that the exporter's sales price is less or likely to be less, than the foreign market value (or, in the absence of such value, than the constructed value), he shall forthwith publish notice of that fact in the Federal Register and shall authorize, under such regulations as he may prescribe, the withholding of appraisement reports as to such merchandise entered, or withdrawn from warehouse, for consumption, not more than one hundred and twenty days before the question of dumping has been raised by or presented to him or any person to whom authority under this section has been delegated, until the further order of the Secretary, or until the Secretary has made public a finding as provided for in subdivision (a) in regard to such merchandise.

(c) The Secretary, upon determining whether foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and the United States Tariff Commission, upon making its determination under subsection (a) of this section, shall each publish such determination in the Federal Register, with a statement of the reasons therefor, whether such determination is in the affirmative or in the negative.

Section 202(a), Antidumping Act of 1921, as amended, 19 U.S.C. § 161(a) (1970):

Amount of duty to be collected; determination of foreign market value of goods.

(a) In the case of all imported merchandise, whether dutiable or free of duty, of a class or kind as to which the

---

which the Commission treated as containing confidential business information and which are subject to the terms of the stipulation for protective order are identified on List No. 2.

4. This claim of privilege was sustained by the Court in an unpublished order entered on December 29, 1978.

Secretary of the Treasury has made public a finding as provided for in section 160 of this title, entered, or withdrawn from warehouse, for consumption, not more than one hundred and twenty days before the question of dumping was raised by or presented to the Secretary or any person to whom authority under said section has been delegated, and as to which no appraisement has been made before such finding has been so made public, if the purchase price or the exporter's sales price is less than the foreign market value (or, in the absence of such value, then the constructed value) there shall be levied, collected, and paid, in addition to any other duties imposed thereon by law, a special dumping duty in an amount equal to such difference.

Section 516, Tariff Act of 1930, as amended, 19 U.S.C. § 1516 (1976):

Petitions by American manufacturers, producers, or wholesalers

(a) Classification, rate of duty, countervailing duty, and antidumping duty furnished upon request; petition; contents

The Secretary shall, upon written request by an American manufacturer, producer, or wholesaler, furnish the classification, the rate of duty, the additional duty described in section 1303 of this title (hereinafter in this section referred to as "countervailing duties"), if any, and the special duty described in section 161 of this title (hereinafter in this section referred to as "antidumping duties"), if any, imposed upon designated imported merchandise of a class or kind manufactured, produced, or sold at wholesale by him. If such manufacturer, producer, or wholesaler believes that the appraised value is too low, that the classification is not correct, that the proper rate of duty is not being assessed, or that countervailing duties or antidumping duties should be assessed, he may file a petition with the Secretary setting forth (1) a description of the merchandise, (2) the appraised value, the classification, or the rate or rates of duty that he believes proper and

(3) the reasons for his belief including, in appropriate instances, the reasons for his belief that countervailing duties or antidumping duties should be assessed.

(b) Determination of petition; notification to petitioner; procedures for countervailing duties and antidumping duties

If, after receipt and consideration of a petition filed by an American manufacturer, producer, or wholesaler, the Secretary decides that the appraised value of the merchandise is too low, that the classification of the article or rate of duty assessed thereon is not correct, or that countervailing duties or antidumping duties should be assessed, he shall determine the proper appraised value or classification, rate of duty, or countervailing duties, or antidumping duties and shall notify the petitioner of his determination. Except for countervailing duty and antidumping duty purposes, all such merchandise entered for consumption or withdrawn from warehouse for consumption more than thirty days after the date such notice to the petitioner is published in the weekly Customs Bulletin shall be appraised or classified or assessed as to rate of duty in accordance with the Secretary's determination. For countervailing duty purposes, the procedures set forth in section 1303 of this title shall apply. For anti-dumping duty purposes, the procedures set forth in section 160 of this title shall apply.

(c) Determination of correctness of initial appraised value, classification, rate of duty, or non-assessment of countervailing duties or antidumping duties; contest by petitioner; procedure

If the Secretary decides that the appraised value or classification of the articles or the rate of duty with respect to which a petition was filed pursuant to subsection (a) of this section is correct, or that countervailing duties or anti-dumping duties should not be assessed, he shall so inform the petitioner. If dissatisfied with the decision of the Secretary, the petitioner may file with the Secretary,

not later than thirty days after the date of the decision, notice that he desires to contest the appraised value or classification of, or rate of duty assessed upon or the failure to assess countervailing duties or antidumping duties upon, the merchandise. Upon receipt of notice from the petitioner, the Secretary shall cause publication to be made of his decision as to the proper appraised value or classification or rate of duty or that countervailing duties or antidumping duties should not be assessed and of the petitioner's desire to contest, and shall thereafter furnish the petitioner with such information as to the entries and consignees of such merchandise, entered after the publication of the decision of the Secretary at such ports of entry designated by the petitioner in his notice of desire to contest, as will enable the petitioner to contest the appraised value or classification of, or rate of duty imposed upon or failure to assess countervailing duties or antidumping duties upon, such merchandise in the liquidation of one such entry at such port. The Secretary shall direct the appropriate Customs Officer at such ports to notify the petitioner by mail immediately when the first of such entries is liquidated.

(d) Contest of Secretary's determination that foreign merchandise is not being sold in United States at less than fair value or that bounty or grant is not being paid

Within 30 days after a determination by the Secretary—

(1) under section 160 of this title, that a class or kind of foreign merchandise is not being, nor likely to be, sold in the United States at less than its fair value, or

(2) under section 1303 of this title that a bounty or grant is not being paid or bestowed,

an American manufacturer, producer, or wholesaler of merchandise of the same class or kind as that described in such determination may file with the Secretary a written notice of a desire to contest such determination. Upon receipt of such notice the Secretary shall cause publication to be made thereof and of such manufacturer's, producer's, or wholesaler's desire to contest the determination. Within 30 days after such publication, such manufacturer, producer, or wholesaler may commence an action in the United States Customs Court contesting such determination.

(e) Appraisal, classification, and liquidation of entries of merchandise covered by published decisions of the Secretary

Notwithstanding the filing of an action pursuant to section 2632 of title 28, merchandise of the character covered by the published decision of the Secretary (when entered for consumption or withdrawn from warehouse for consumption on or before the date of publication of a decision of the United States Customs Court or of the United States Court of Customs and Patent Appeals, not in harmony with the published decision of the Secretary) shall be appraised or classified, or both, and the entries liquidated, in accordance with the decision of the Secretary and, except as otherwise provided in this chapter, the final liquidations of these entries shall be conclusive upon all parties.

(f) Consignee or his agent as party in interest before the Customs Court

The consignee or his agent shall have the right to appear and to be heard as a party in interest before the United States Customs Court.

(g) Appraisement, classification, and assessment of duty of merchandise covered by published decision of the Secretary in accordance with final judicial decision of Customs Court or Court of Customs and Patent Appeals sustaining cause of action in whole or in part; suspension of liquidation of entries

If the cause of action is sustained in whole or in part by a decision of the United States Customs Court or of the United States Court of Customs and Patent Appeals, merchandise of the charac-

ter covered by the published decision of the Secretary, which is entered for consumption or withdrawn from warehouse for consumption after the date of publication of the court decision, shall be subject to appraisement, classification, and assessment of duty in accordance with the final judicial decision in the action, and the liquidation of entries covering the merchandise so entered or withdrawn shall be suspended until final disposition is made of the action, whereupon the entries shall be liquidated, or if necessary, reliquidated in accordance with the final decision.

(h) Regulations implementing required procedures

Regulations shall be prescribed by the Secretary to implement the procedures required under this section.

## PLAINTIFFS' CONTENTION

Plaintiffs contend that Treasury's amendment of its determination of sales at LTFV so as to exclude from the term "battery service tools" all tools other than battery terminal lifters after transmittal of the investigation to the Commission was *ultra vires*. Further, plaintiffs claim that the Commission erred as a matter of law by eliminating from the class or kind of merchandise under investigation all battery service tools other than battery terminal lifters; and that the Commission's negative determination is arbitrary, capricious, and not supported by substantial evidence. Hence, plaintiffs seek an order setting aside the Commission's negative injury determination and directing Treasury to publish a finding of dumping with the result that antidumping duties will be assessed, where appropriate, on entries of the subject hand tools from Japan.

## GOVERNMENT'S CONTENTION

The Government contends that the Court is limited to a review of the Commission's Statement of Reasons in deciding whether the Commission's determination is arbitrary, capricious, or otherwise contrary to law. Relying upon the foregoing scope and

standard of review, defendant urges that the Commission, in its Statement of Reasons, applied proper legal criteria and considered appropriate indicia of injury, and therefore its determination is not arbitrary, capricious, or otherwise contrary to law. Moreover, defendant maintains that in any event, the Commission's determination is supported by the administrative record, as transmitted to the Court. Finally, defendant insists that Treasury acted lawfully in amending its LTFV determination.

## ISSUES PRESENTED

1. Whether the Commission's negative injury determination is arbitrary, capricious, or otherwise contrary to law.

2. Whether Treasury's amendment of its LTFV determination after transmittal to the Commission of the antidumping investigation was *ultra vires*.

## OPINION

### I

■ For the scope and standard of review applicable to the Commission's injury determinations see my recent opinion in *Armstrong Bros. Tool Co. et al. v. United States (Daido Corporation, Steelcraft Tools Division, Party-in-Interest)*, 483 F.Supp. 312, 84 Cust.Ct. ——, C.D. 4838 (1980), *appeal pending* ("*Armstrong I*"), and cases cited therein. See also *SCM Corporation v. United States (Brother International Corporation, Party-in-Interest)*, 487 F.Supp. 96, 84 Cust.Ct. ——, C.R.D. 80–2 (1980). In the present case, following the rationale of *Armstrong I*, I have carefully reviewed the entire administrative record transmitted to the Court, and do not find the Commission's determination to be arbitrary, capricious, or otherwise contrary to law, as claimed by plaintiffs. Moreover, I am unable to agree with plaintiffs' contention that the Commission's determination is not supported by substantial evidence.

In *Armstrong I*, I emphasized the intent of Congress to provide the Commission with a wide latitude within which to determine the existence or nonexistence of injury un-

der the Antidumping Act, and discussed the indicia of injury generally considered by the Commission in its investigations. From the Commission's Statement of Reasons in the instant case, it is evident that the Commission considered and carefully analyzed a number of pertinent economic and financial factors, including domestic industry shipments, exports, profits, prices, unfilled orders and other relevant factors. Thus, in its Statement of Reasons, the Commission found:

First:

*U. S. industry*—The U.S. industry most likely to be adversely affected by imports sold at LTFV consists of the facilities in the United States devoted to the production of chisels, punches, hammers and sledges (with or without handles), vises, c-clamps, and battery terminal lifters. These articles are produced at plants located throughout the United States, and are sold primarily to industrial-commercial distributors, hardware wholesalers and cooperatives, automotive-service-market wholesalers, and several mass-merchandise retail chains.

Second, the markets in the United States for the domestic tools and the Japanese tools are different. On this aspect, the Commission found:

*The imported articles*—The tools imported from Japan are generally limited to the hardware wholesale and mass-merchandise retail markets. The evidence developed during the investigation indicates that imports, overall, are of somewhat lower quality and sell at commensurately lower prices, making such imports generally more suitable for sale in retail outlets primarily serving the occasional user. By contrast, the tools produced by domestic manufacturers are sold primarily for use in industry, by professional tradespeople, and by skilled craftsmen.

Third, the Commission found that the market penetration by the imports which occurred did not result from LTFV sales:

*Import penetration and lost sales*—Import market penetration remained at about 6 percent during 1972–74, a period which includes Treasury's investigation, April 1–September 30, 1974. Although imports from Japan increased more rapidly in the first 8 months of 1975 than in the preceding 3 years, *the increase can be largely attributed to imports of vises which were the result of orders placed in Japan because of the inability of the domestic producers to meet increased demand on time.* [Emphasis added.]

Fourth, the Commission could find no substantiation for the domestic industries' allegations of lost sales. Any lost sales were attributable to factors other than LTFV sales:

It was established during the investigation that some domestic distributors of the tools under consideration have either turned to Japanese imports or increased such imports because of the difficulties experienced by domestic producers in making shipments during recent raw materials shortages. Other alleged losses of sales by domestic producers to imports were not substantiated; the firms involved have, in fact, been importing or purchasing imported Japanese tools for more than a decade and have not significantly increased such purchases during the period of the investigation. Several distributors indicated that their reason for accepting imported tools was to widen the selection to their dealers in terms of range of quality and price. The Commission could not corroborate allegations that the domestic industry had lost sales of the subject articles because of LTFV sales of certain Japanese imports.

Fifth, despite the LTFV import sales, domestic shipments and exports of the hand tools under consideration rose in line with increased domestic demand in the period investigated (1971–1974), and exports of such tools by domestic producers increased during the same period. This increase in demand for domestic tools resulted in higher unfilled orders during 1972–1974, reflecting the domestic producers' difficulty in meeting the increased demand. The decline of U.S. shipments and exports in the first eight months of 1975 were attributable to factors unrelated to the LTFV imports:

The decline in U.S. shipments in the first 8 months of 1975 slightly exceeded the decline in apparent domestic consumption, reflecting the greater sensitivity of the generally higher quality, higher priced domestic tools to the reduced industrial activity in the United States. The decline in exports in the first 8 months of 1975 appears to reflect the economic recession in industrial countries abroad.

Sixth, when the effect of LTFV sales on prices was investigated, the Commission found no evidence of price suppression or depression, and the data obtained in the investigation showed that prices for domestic and imported tools increased consistently for several years.

Seventh, it was further found that profitability and employment were not adversely affected by the LTFV sales:

*Profitability and employment* — The financial data of the domestic industry, as reported to the Commission, indicate increased net sales of chisels, punches, hammers, sledges, vises, and c-clamps during 1972–74. The ratio of net operating profit to net sales of these tools remained at about 9 percent in 1972 and 1973. The rise in production costs during 1974 occurred faster than the domestic producers could raise their prices, creating a temporary decline in profits during that period. However, this situation reversed during 1975, when the profits were higher than in previous years.

Employment and man-hours in the domestic industry increased throughout the period 1971–74. Although employment declined slightly in the first 8 months of 1975, total man-hours worked continued to increase.

Finally, the Commission found no likelihood of injury:

*No likelihood of injury* — The evidence obtained for the period of the investigation also indicates that there is no likelihood of injury to the domestic industry within the meaning of the Antidumping Act, 1921, as amended. In 1974, U. S. shipments increased at a greater rate than imports from Japan. With the exception of vises, imports of the tools under consideration declined in the first 8 months of 1975. It is reasonable to expect that U. S. shipments will increase with improvement in overall economic activity. The latest data on the profitability of the domestic industry show no evidence of future injury.

From the economic and financial criteria applied and the facts and circumstances delineated in the Commission's Statement of Reasons, the Commission adequately demonstrated that the domestic industry was neither injured nor was likely to be injured by reason of the LTFV imports. There is no indication that an incorrect legal standard or any unreasonable criteria of injury were utilized. Thus, from the Commission's Statement of Reasons I am not persuaded that the determination was arbitrary and capricious, as claimed by plaintiffs.

Indeed, plaintiffs do not contend that the criteria of injury employed by the Commission were arbitrary and capricious. Rather, plaintiffs maintain that "[i]t was erroneous as a matter of law for the Commission not to have reached an affirmative injury determination in light of the severe margins of dumping, the consequential unfair competitive advantage enjoyed by the LTFV imports, and the significant levels of market penetration, particularly when said penetration was accomplished through the competitive leverage created via the LTFV pricing and was accompanied by severe market disruptions". (Memorandum, at 14.) These "market disruptions", plaintiffs argue, are supported by evidence in the record of high and rising market penetration of the imported tools which caused serious declines in domestic industry profits, lost sales, price suppression, sharp declines in domestic production and shipments, and sharp curtailment in investment in industrial capacity. Plaintiffs further urge that the record shows that the sales of the LTFV Japanese hand tools have precluded the entry of certain domestic producers into the low-quality, low-price hand tools market. Lastly, plaintiffs characterize the

Commission's finding of a lack of competition between the LTFV imports and the domestically produced hand tools as one of the critical deficiencies in the Commission's decision. In short, plaintiffs insist that had the Commission concluded that the LTFV imports competed directly with the domestic hand tools, it would have been obligated to find, as a matter of law, that an industry in the United States was being or was likely to be injured.

■ It is evident that plaintiffs' arguments essentially challenge discretionary findings by the Commission. Fundamentally, it is not the function of the Court in reviewing an injury determination of the Commission under the Antidumping Act to weigh the evidence or substitute its judgment for that of the Commission. *City Lumber Co. et al. v. United States*, 59 CCPA 89, C.A.D. 1045, 457 F.2d 991 (1972); *Imbert Imports, Inc., et al. v. United States*, 60 CCPA 123, C.A.D. 1094, 475 F.2d 1189 (1973). Moreover, since the Commission based its determination on a consideration of appropriate indicia of injury, absent any clear error of judgment (and I find none), the Commission's determination cannot be regarded as arbitrary or capricious. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., et al.*, 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), *reh. denied*, 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975); *Citizens to Preserve Overton Park, Inc., et al. v. Volpe, Secretary of Transportation, et al.*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

Addressing the question of the scope and extent of judicial power to set aside the ruling of an administrative agency, the Court of Appeals made this relevant observation in *Deutsch v. United States Atomic Energy Commission*, 401 F.2d 404, 407 (C.A. D.C.1968):

We are urged to overrule the [Atomic Energy] Commission's holding that petitioner is not entitled to an award upon the ground that this conclusion is arbitrary and capricious and lacks substantial evidence in the record supporting or justifying this ruling. We were told, moreover, on oral argument that the factual basis for the Commission's holding is clearly and completely erroneous as a matter of scientific knowledge and phenomenon. The briefs and supporting documents filed by both parties are extensively devoted to presentation and argument as to the correctness, or the falsity of scientific principles related to radioactive material and products, atomic energy, irradiation, the nucleus of the atom and the action and reaction of its protons and neutrons. We are therefore confronted at the very threshold of this case with the ever-recurring question of the scope and extent of our authority to set aside the ruling of an administrative agency. Despite our daily diet of challenges to administrative agency action and our resulting repeated efforts to articulate the limits of judicial review of such actions we nevertheless are continually called upon to substitute our judgment on factual issues for that of the agency charged by Congress with the initial responsibility of making, evaluating, and acting upon those facts. *It is well settled that the fact-finding function is within the exclusive province of the administrative agency.* We appear unable to establish a substantial recognition at the Bar that "[t]he judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." *Rochester Telephone Corp. v. United States*, 307 U.S. 125, at 146, 59 S.Ct. 754, at 765, 83 L.Ed. 1147 (1939). [Emphasis added; footnote omitted.]

See also the recent opinion of Judge Maletz in *Pasco Terminals Inc. v. United States*, 83 Cust.Ct. ——, C.D. 4823, 477 F.Supp. 201 (1979), *appeal pending*, wherein the Court addressed the discretionary authority of the Commission in injury determinations under the Antidumping Act and the applicable standard of judicial review.

In light of the above-cited authorities, it would be impermissible for me to substitute my judgment for that of the Commission or to re-weigh the evidence as to specific fac-

tual findings. After a careful and searching review of the administrative record, I hold that the findings of the Commission discussed above have a rational basis in fact and are supported by substantial evidence.

That plaintiffs might be able to draw conclusions from the record inconsistent with those reached by the Commission does not mean that the Commission's determination is not supported by "substantial evidence". As observed by the Supreme Court in *Consolo v. Federal Maritime Commission et al.*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966):

> * * * the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. *Labor Board v. Nevada Consolidated Copper Corp.*, 316 U.S. 105, 106, 62 S.Ct. 960, 86 L.Ed. 1305; *Keele Hair & Scalp Specialists, Inc. v. FTC*, 5 Cir., 275 F.2d 18, 21.

It is emphasized that in deciding whether the Commission's determination meets the substantial evidence test, the Court does not solely consider the transcript of the public hearing and the public documents received by the Commission. The record before the Commission (and now before the Court) comprises a number of confidential documents, the content of which may not now be divulged or discussed in this opinion. Nevertheless, the defendant has submitted an "accounting" of the evidence in the record supporting each of the factual findings of the Commission, and it suffices to state that I find the Commission's determination is clearly supported by substantial evidence.[5]

To buttress their contentions, plaintiffs have cited certain prior affirmative injury determinations by the Commission as "precedents". However, plaintiffs have failed to demonstrate that all the facts found by the Commission in the present case are identical with those found in the prior investigations cited. Defendant, on the other hand, has shown that this case is not factually identical with the prior investigations cited by plaintiffs. As stressed in *Armstrong I*, each injury investigation is *sui generis*, involving a unique combination and interaction of many economic variables; and consequently, a particular circumstance in a prior investigation cannot be regarded by the Commission as dispositive of the determination in a later investigation. Thus, as concluded in *Armstrong I*, injury investigations are properly decided by the Commission on a case by case basis.[6]

In summary, I find that the Commission applied the proper legal standards and considered appropriate economic and financial criteria in making its negative determination; and that its determination is supported by the administrative record. Accordingly, I must reject plaintiffs' claim that the Commission's determination is arbitrary, capricious, and not supported by substantial evidence.

## II

Under the Antidumping Act of 1921, as amended, Treasury has the responsibility to determine whether a class or kind of foreign merchandise is being or is likely to be sold in the United States at LTFV. If Treasury determines that there are LTFV sales of a class or kind of foreign merchandise, Treasury must so advise the International Trade Commission, which then undertakes an investigation to determine whether a domestic industry is being injured or is likely to be injured, or is prevented from being established, by reason of such sales at LTFV. 19 U.S.C. § 160(a).

We now consider whether Treasury's amended determination of sales at LTFV of October 21, 1975 was *ultra vires* because the antidumping investigation had already been transmitted to the Commission, and the Commission had already instituted its injury investigation.

---

5. This is not meant to imply that the Commission's determination *must* meet the "substantial evidence" test.

6. Defendant concedes that this case by case approach does not carry with it a grant of *carte blanche* or authority to decide cases in an arbitrary or capricious manner.

Plaintiffs claim that after transmittal of the antidumping investigation to the Commission, Treasury had no further authority to act in the matter of determining the existence of sales at LTFV, and that the Commission acted unlawfully in narrowing the scope of its injury investigation to conform to Treasury's amended determination of sales at LTFV. Consequently, according to plaintiffs, the final injury determination was insufficient as a matter of law in that it failed to cover battery service tools other than battery terminal lifters.

As we have seen, the term "battery service tools", as used initially by Treasury and the Commission, included battery terminal lifters, battery post and terminal cleaning brushes, battery terminal spreaders, angle-nose pliers, booster cables and battery service kits (terminal puller, cleaning brush and two terminals). 40 FR 24218, 41155 and 42607. However, after the Commission had commenced its investigation, Treasury amended its affirmative LTFV determination to exclude all battery service tools except battery terminal lifters (40 FR 49111); and subsequently the Commission amended the scope of its injury investigation in conformity with Treasury's amended LTFV determination, by excluding the battery service tools, other than battery terminal lifters (40 FR 50320).

The reasons for Treasury's amendment of its LTFV determination are set forth in a memorandum dated November 10, 1975 from Peter O. Suchman to David R. Macdonald (attached to defendant's memorandum as exhibit 1). From the Suchman memorandum the following facts appear: [7]

The "battery service tools" encompassed within Treasury's original LTFV determination comprised six different types of tools: battery terminal lifters, battery service kits (terminal puller, cleaning brush and two terminals), battery post and terminal cleaning brushes, battery terminal spreaders, angle-nose pliers, and booster cables. Due to the insignificant volume of trade involved in "battery service tools" relative to the total volume of hand tools covered by the investigation, battery service tools were treated as a single class or kind of merchandise. Since a substantial margin of dumping was found on terminal lifters, an affirmative determination of sales at LTFV was issued on "battery service tools". However, no dumping margins were found on battery service kits, brushes, terminal spreaders or angle-nose pliers, and no information was received on booster cables.

It further appears from the Suchman memorandum that after the Commission received the investigation from Treasury, the Commission informed Treasury that the absence of any margin information on five of the six categories of battery service tools "posed serious problems", and that each of the tools within the battery service tools category should be considered individually since they are not competitive with one another. Treasury then decided that it was inappropriate to consider all the battery service tools together as a single class of merchandise, and treated each of the battery service tools separately. When considered individually, Treasury concluded that its original affirmative LTFV determination covering the battery service tools was improper inasmuch as five of the six tools (viz., all tools except the battery terminal lifters) "showed no margins".

Against this factual background, I am not persuaded that Treasury's action in amending its LTFV determination was *ultra vires*, as claimed by plaintiffs. I agree with defendant that Treasury's amendment is clearly authorized by section 153.42 (in 1975, section 153.39) of the Customs Regulations promulgated under the authority of 19 U.S.C. § 173. Section 173 authorizes Treasury to make rules and regulations necessary for the enforcement of the Antidumping Act.

---

7. This memorandum was furnished by defendant to plaintiffs pursuant to their discovery, with the last paragraph deleted on the ground of privilege. This claim of privilege was sustained by the Court in an order entered on

March 27, 1979. *Armstrong Bros. Tool Co. et al. v. United States*, 483 F.Supp. 312, 82 Cust.Ct. 344, C.R.D. 79–8 (1979). Plaintiffs do not dispute the correctness of the factual matters set forth in the memorandum.

Section 153.42 of the Customs Regulations reads:

153.42 Revocation of determination of sales at less than fair value; determination of sales at not less than fair value. [§ 153.39 in 1975]

If the Secretary is persuaded from information submitted or arguments received that his determination of sales at less than fair value was in error, and if the United States International Trade Commission has not yet issued a determination relating to injury, he will publish a notice of "Revocation of Determination of Sales at Less Than Fair Value", or if appropriate, a notice of "Modification of Determination of Sales at Less Than Fair Value", which notice will set forth a description of the merchandise involved and state the reasons upon which it was based. The Secretary will notify the United States International Trade Commission of his action. [19 CFR § 153.42.]

■ Fundamentally, duly authorized customs regulations have the force and effect of law. *Socony Vacuum Oil Co., Inc. v. United States*, 44 CCPA 83, C.A.D. 641 (1957); *Gallagher & Ascher v. United States*, 14 Ct.Cust.Appls. 38, T.D. 41548 (1926); *Plywood & Door Southern Corp. v. United States*, 57 Cust.Ct. 309, C.D. 2800 (1966). Plainly, after becoming aware of the error in its original determination of sales at LTFV, Treasury had an obligation to observe its own regulation by making an appropriate modification of its original determination.

Plaintiffs' contention that Treasury's "second thoughts" on the matter of sales at LTFV respecting battery service tools were disruptive of the Commission's investigation (which was already in progress) is without merit. On that score, it need only be recalled that the impetus for the amendment came from the Commission's own staff which complained to Treasury that its *original determination* "posed serious problems" (Suchman memorandum).

Under all the facts and circumstances herein, I have concluded that Treasury's amendment of its determination of sales at LTFV was not *ultra vires.* In view of the foregoing conclusion, it follows that the Commission acted lawfully in limiting the scope of its injury investigation and determination to exclude battery service tools other than battery terminal lifters.

## CONCLUSION

For the foregoing reasons: plaintiffs' motion for summary judgment is denied; defendant's cross-motion for summary judgment is granted; and the action is dismissed.

It will bear repetition for the Court to express publicly its sincere appreciation to Mr. Frederick L. Ikenson, attorney for the plaintiffs, and to Messrs. David M. Cohen, Joseph I. Liebman and Sidney N. Weiss, counsel for the Government, for their professional skill and assistance in aiding the Court.