Slip Op. 05 - 37

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - x
CARIBBEAN ISPAT LIMITED,                :

                       Plaintiff,   :

            v.                          : Court No. 02-00756

UNITED STATES,                          :

                       Defendant.    :

- - - - - - - - - - - - - - - - - - x


Opinion & Order

[Plaintiff's motion for judgment upon the
 agency record denied; action dismissed.]

Decided:  March 22, 2005


     Steptoe & Johnson LLP (Mark A. Moran, Matthew S. Yeo and
Evangeline D. Keenan) for the plaintiff.

     Lyn M. Schlitt, General Counsel, James M. Lyons, Deputy
General Counsel, and Irene H. Chen, U.S. International Trade
Commission, for the defendant.

     Collier Shannon Scott, PLLC (Paul C. Rosenthal, R. Alan Lu-
berda and Kathleen W. Cannon) for intervenor-defendants Georgetown
Steel Company, LLC et al.


          AQUILINO, Senior Judge:  The above-encaptioned plaintiff

producer of steel in the Republic of Trinidad and Tobago ("RTT"),

which apparently has recently changed its corporate name to Mittal

Steel Point Lisas Limited, pleads for relief from that part of the

final determination of the U.S. International Trade Commission

("ITC") sub nom. Carbon and Certain Alloy Steel Wire Rod From

Brazil, Canada, Germany, Indonesia, Mexico, Moldova, Trinidad and

<u>Tobago, and Ukraine</u>, 67 Fed.Reg. 66,662 (Nov. 1, 2002), which con-
cluded that the domestic U.S. industry is materially injured by
reason of its exports found to have been sold here at less than
fair value.  Its complaint is that that determination is not
supported by substantial evidence on the record and the commission-
ers voting in the affirmative did not perform the proper "by reason
of" analysis that 19 U.S.C. §1673d(b)(1) requires.  Whereupon the
plaintiff prays that this court remand the matter to the Commission
to

> reconsider and explain fully whether the volume of
> imports from Trinidad and Tobago was significant, had
> significant price effects, and had a significant adverse
> impact during the period of investigation in light of
> other known and potential causes of injury, in particu-
> lar, the effects of other subject and non-subject im-
> ports[1], and to provide an adequate explanation as to how
> it ensured that it did not attribute the effects of other
> subject and non-subject imports to imports from [RTT];

to quote from the proposed form of order accompanying its motion
for judgment upon the agency record that has been interposed[2] pur-
suant to USCIT Rule 56.2.

---

[1] The "other subject" imports to which the plaintiff refers
came from Brazil, Canada, Germany, Indonesia, Mexico, Moldova and
Ukraine.  The "non-subject" imports refer to Egypt, South Africa,
Turkey and Venezuela, as well as to those from "other sources".
Those "other sources" in the tables appended to that determination
refer to  countries that exported wire rod which was not within the
scope of the investigation.

[2] The plaintiff has also filed a motion for oral argument that
need not be granted, given the quality of its written submissions,
as well as of those on behalf of the parties in opposition to its
motion for judgment.

The court's jurisdiction to decide this motion is based upon 19 U.S.C. §1516a(a)(2)(A)(i)(II) and 28 U.S.C. §§ 1581(c), 2631(c). And, whatever the issues raised, defendant's determination must be affirmed unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law". 19 U.S.C. §1516a(b)(1)(B)(i).

I

The imports from RTT were subjected to separate material-injury analysis, as mandated by an exception to the ITC cumulation requirement. That is, per 19 U.S.C. §1677(7)(G)(i)(I) when petitions are filed on the same day, the Commission is required to assess cumulatively the volume and effect of the subject merchandise from all countries, except that

> from any country designated as a beneficiary country under the Caribbean Basin Economic Recovery Act (19 U.S.C. 2701 et seq.) for purposes of making a determination with respect to that country[.]

19 U.S.C. §1677(7)(G)(ii)(III). This exception applies to Trinidad and Tobago[3] herein and underlies plaintiff's complaint. See, e.g.,

---

[3] RTT is a designated beneficiary country under the Caribbean Basin Economic Recovery Act ("CBERA"). See Pub. L. No. 98-67, Title II, §212(a)-(b), 97 Stat. 384, 385 (Aug. 5, 1983); HTSUS General Note 4(a) (1999). The rationale for this exception is that the ITC undertake an injury analysis in a manner consistent with the statute's goal of promoting economic growth and development in the Caribbean. See H.R. Conf. Rep. No. 101-650, p. 135 (1990)("The conferees emphasize that this provision is intended to benefit CBI beneficiary countries, consistent with the specific objectives of the CBI program"). But Congress did not intend that this provision preclude an affirmative determination of material injury for a CBERA beneficiary in an investigation covering imports from other areas of the world, which themselves are required to be cumulated. See, e.g., id.

Connecticut Steel Corp. v. United States, 18 CIT 313, 314 and 852 F.Supp. 1061, 1063 n. 1 (1994) (affirming ITC negative preliminary determination with respect to RTT); Certain Steel[] Wire Rod From Canada, Germany, Trinidad and Tobago, and Venezuela, 63 Fed.Reg. 14,475 (March 25, 1998)(negative final determination with regard to RTT); Certain Steel Wire Rod From Canada, Germany, Trinidad and Tobago, and Venezuela, 62 Fed.Reg. 63,958 (Dec. 3, 1997)(negative final determination as to RTT).

According to the plaintiff, only the ITC chairman undertook to determine whether imports from RTT "by themselves" caused material injury, considering the much-larger volumes of lower-priced subject and non-subject imports into the domestic market during the period of investigation:

> . . . Her analysis, which fully accounted for the critical volume and pricing evidence . . ., led her to dissent from the Commission Majority's affirmative determination on the grounds that imports from [RTT] did not make a material contribution to the domestic industry's injured condition.

Plaintiff's Opening Brief, p. 11. Further:

> Chairman Okun's dissenting opinion is significant for purposes of this appeal not for the ultimate conclusion she reached, but rather because it demonstrates the type of analysis that must be undertaken to ensure compliance with the legal obligation that injury from other sources not be attributed to imports from Trinidad and Tobago.

Id. at 23. Indeed, her ITC colleagues do not disagree with her stated premise that, because RTT

> is a beneficiary country under . . . CBERA[], imports
> from Trinidad and Tobago may only be cumulated with
> imports from another CBERA country for purposes of deter-
> mining material injury, or threat thereof, by reason of
> imports from the CBERA beneficiary country or countries.
> [RTT] is the only subject country in these investigations
> that is a CBERA country. Therefore, my analysis of
> whether the domestic industry is materially injured or
> threatened with material injury by reason of wire rod
> from [RTT] is limited to a consideration of subject
> imports from [there] alone.[4]

Rather, their views of the causation factors disagree. With regard to volume, they note that, throughout the period of investigation, RTT was the second or third largest source of subject wire rod imports into the U.S. market, and find, in that "price sensitive market", RTT's

> absolute volume levels and market share, and their in-
> crease from 1999 to 2001, to be significant in absolute
> terms and relative to production and consumption in the
> United States.[5]

As for price,

> subject imports from [RTT] are concentrated in the low to
> medium carbon industrial quality wire rod category,
> commodity products that are highly price sensitive.
> Subject imports from Trinidad are highly substitutable
> with the domestic product in that category, which rein-
> forces the price competition between subject imports from
> [RTT] and the domestic product.
>
> Subject imports from [RTT] undersold comparable U.S.
> products in 70.8 percent of quarterly comparisons from
> 1999 to 2001. For Products 1 and 2, both of which were
> grades of industrial quality wire rod, subject imports

---

[4] Defendant's Appendix, List 1, Doc. No. 199, USITC Pub. 3546, p. 39 (Oct. 2002) (footnote omitted).

[5] Id. at 37 (footnotes omitted).

from [RTT] undersold the domestic industry in 22 out of 26 comparisons by margins that ranged up to 11.0 percent. The highest quantity of available price comparisons between imports from [RTT] and the domestic product were for Products 1 and 2. Eight purchasers rated the U.S. product inferior (higher) in price to [RTT] subject imports . . ., and only one purchaser ranked the domestic product superior (lower) in price to subject imports from [RTT]. In light of the importance of price in purchasing decisions, and the significant and increasing volume of subject imports from Trinidad and Tobago from 1999 to 2001, we find the underselling indicated by the pricing data, and corroborated by the other information in the record, to be significant.

We find that subject imports from Trinidad and Tobago have had significant adverse price suppressing effects. Pricing pressure from the readily available and increasing volume of lower-priced subject imports from [RTT] prevented the domestic industry from raising prices when its costs increased, particularly in the price-sensitive low carbon industrial quality wire rod category. As stated earlier, [RTT] subject imports . . . are concentrated in that category. The cost-price squeeze experienced by the domestic industry described above was exacerbated by its declining shipments and consequent declining revenues, particularly during 2001, as lower-priced imports from [RTT] increased in volume by 23.5 percent and gained market share at the expense of the domestic industry.

We therefore find that there has been significant price underselling by subject imports from Trinidad and Tobago of the domestic product, and that subject imports have suppressed prices of domestically produced wire rod to a significant degree.[6]

Finally, regarding the impact of RTT volume and price, the Commission majority view is as follows:

. . . [D]uring the investigation period, the domestic industry experienced growing operating losses, decreased production, shipments, capacity and capacity utilization,

---

[6] Id. at 37-38 (footnotes omitted).

declining employment indicators, increasing costs, and suppressed prices.  Trinidad and Tobago, which was ranked as the second or third most significant subject import supplier throughout the period, shipped increasing volumes of subject imports that undersold the domestic wire rod in a majority of comparable periods.  Thus, based on the significant and increasing volume and market share of subject imports from [RTT] in a declining market, the significant price underselling, and significant price suppression by these imports, and declining industry indicators from 1999 to 2001, we find that the subject imports from Trinidad and Tobago are having a significant adverse impact on the domestic industry producing wire rod.[7]

A

The core of the controversy is the jurisprudence interpreting the causation requisite of 19 U.S.C. §1673d(b)(1).  According to that section, an affirmative injury determination has two elements, the first being that a domestic industry is materially injured, and the second that it be "by reason of" the imports under investigation.  See, e.g., Gerald Metals, Inc. v. United States, 132 F.3d 716, 719-20 (Fed.Cir. 1997).  In order to make such findings, commissioners must determine whether factors listed in 19 U.S.C. §1677(7)(B)(i) are significant, and, if so, decide whether overall they indicate that the subject imports are causing material injury to the domestic industry. See 19 U.S.C. §1677-(7)(C).

The Court of Appeals for the Federal Circuit has interpreted the "by reason of" language of section 1673d(b)(1) to mean that "adequate evidence" on the record demonstrate that sub-

_____

[7] Id. at 38 (footnotes omitted).

ject imports contribute more than minimally or tangentially to the injury sustained by the domestic industry. E.g., Taiwan Semiconductor Indus. Ass'n v. Int'l Trade Comm'n, 266 F.3d 1339, 1345 (Fed.Cir. 2001); Gerald Metals, Inc. v. United States, 132 F.3d at 722. With respect to such evidence, the ITC must present an "adequate explanation" of its differentiation of the injurious effects of the RTT subject imports from those of other sources of injury. Altx, Inc. v. United States, 26 CIT 709, 731 (2002), quoting Taiwan Semiconductor Indus. Ass'n v. United States, 23 CIT 410, 414-17, 59 F.Supp.2d 1324, 1329-31 (1999), citing Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. Doc. No. 103-316, vol. 1, pp. 851-52 (1994). It is not, however, "required to isolate the effects of subject imports from other factors contributing to injury" or to draw "bright-line distinctions" between the impact of subject imports and other causes. E.g., Asociacion de Productores de Salmon y Trucha de Chile AG v. U.S. Int'l Trade Comm'n, 26 CIT 29, 43, 180 F.Supp.2d 1360, 1375 (2002) (citations omitted).

(1)

Relying on Gerald Metals and Taiwan Semiconductor, the plaintiff seeks to compel analysis as to whether the imports from RTT were "material" in view of other subject and non-subject imports. See Plaintiff's Opening Brief, p. 9. Those cases, however, only require that the ITC determine whether "other factors" sever the casual link between RTT imports and injury to

the domestic industry.  In <u>Taiwan Semiconductor</u>, 266 F.3d at 1345, the Federal Circuit affirmed a CIT remand because "the Commission did not consider the injurious effects of . . . other factors" when evaluating the harm caused by subject imports from Taiwan to the domestic industry.  Those "other factors" included non-subject[8] imports, but not other dumped or subsidized subject imports.  And, likewise in <u>Gerald Metals</u>, 132 F.3d at 723, the court of appeals reversed the CIT's holding because the ITC in that matter had identified a significant presence of "fairly-traded" imports, as opposed to those dumped or subsidized, but ignored their impact on the domestic industry in its "by reason of" analysis.

As pointed out by reference to the SAA in defendant's brief, when the Commission performs that analysis, it is required to

> examine all relevant evidence, including any known factors, other than dumped [or subsidized] subject imports which at the same time are injuring the domestic industry . . ..

Defendant's Opposition Brief, p. 11, quoting SAA, p. 851 (1994) (brackets in original).  Hence, the other subject imports herein found by the International Trade Administration, U.S. Department of Commerce ("ITA") to have been either subsidized or sold in the

---

[8] There, the ITC considered non-subject imports those beyond the scope of the investigation.  Here, seemingly without explanation, imports from Egypt, South Africa, Turkey and Venezuela were considered non-subject by the ITC even though they were within such scope.  <u>See</u> <u>Notice of Preliminary Determination of Sales at Less Than Fair Value: Carbon and Certain Alloy Steel Wire Rod from Germany</u>, 67 Fed.Reg. 17,384, 17,385 (April 10, 2002).

United States at less than fair value are excluded from those
"other factors" that the commissioners are required to take into
account.[9]

The same rationale applies to the imports from Turkey
which were improperly categorized as non-subject by the ITC and
subsequently in plaintiff's motion.  That is, those imports were
within the scope of the investigation, albeit dismissed therefrom
because the ITA found their rate of subsidization to be *de minimis*
within the meaning of 19 U.S.C. §§ 1671b(b)(4) and 1671d(a)(3).
See Final Negative Countervailing Duty Determination: Carbon and
Certain Alloy Steel Wire Rod from Turkey, 67 Fed.Reg. 55,815 (Aug.
30, 2002).  But that subsequent, statutorily-mandated determination
does not exclude those imports from investigation.

(2)

The only remaining claim raised herein is whether the ITC
failed to compare RTT subject imports with those not dumped or

---

[9] This is not post-hoc rationalization by the defendant,
rather the SAA is an authoritative interpretation of the Uruguay
Round agreements.  Compare SAA, p. 656 with Plaintiff's Reply
Brief, pp. 8-12.  And even though the defendant admits that it did
compare the subject imports from Israel with those from China in
Pure Magnesium From China and Israel, 66 Fed.Reg. 58,162 (Nov. 20,
2001), "each injury investigation is *sui generis*".  Citrosuco
Paulista, S.A. v. United States, 12 CIT 1196, 1209, 704 F.Supp.
1075, 1087 (1988), quoting Armstrong Bros. Tool Co. v. United
States, 84 Cust.Ct. 102, 115, C.D. 4848, 489 F.Supp. 269, 279
(1980).  Furthermore, the causation analysis in that determination
does not set a precedent for any future investigation. See, e.g.,
Gerald Metals, Inc. v. United States, 22 CIT 1009, 1015, 27
F.Supp.2d 1351, 1357 (1998)("the antidumping statute on its face
does not compel a single method for analyzing causation, so long as
the requirements of 19 U.S.C. §1677(7)(B)-(C) are met").

subsidized.[10]   According to the case law cited above, the Commission must not attribute the effects caused by other sources of injury to those caused by subject imports from a country like Trinidad and Tobago.  Here, the plaintiff asserts that there was "critical evidence" contradicting the ITC's finding of "significance" with respect to the volume of RTT imports.  Plaintiff's Opening Brief, pp. 20-21.  Counsel depict that evidence in a table with four distinct column headings labeled from left to right: "**Other Subject Imports**", "**Non-Subject Imports**", "**Subject + Non-Subject**", and "**Trinidad & Tobago**".  Id. at 21 (boldface in original).  A comparative analysis follows therein, where the data corresponding to the column heading "**Trinidad & Tobago**" are compared to those in the other columns.

But this comparison exposes plaintiff's paradox.  That is, the ITC is not required to compare **"Other Subject Imports"** and **"Non-Subject Imports",** together or separately, with **"Trinidad and Tobago"**.  And even though non-subject imports must be examined as an "other factor", this does not mean that they will be determinative, or even relevant, to the volume, price effects, or adverse

---

[10]   In response to plaintiff's suggestion that attribution of injury is misplaced, e.g., imports from Egypt, South Africa and Venezuela, those imports were found to be negligible within the meaning of 19 U.S.C. §§ 1673b(a) and 1677(24)(A)(i)(I).  See Carbon and Certain Alloy Steel Wire Rod From Brazil, Canada, Egypt, Germany, Indonesia, Mexico, Moldova, South Africa, Trinidad and Tobago, Turkey, Ukraine, and Venezuela, 66 Fed.Reg. 54,539 (Oct. 29, 2001).

impact the ITC is required to consider.  For example, the analysis the ITC is required to perform is whether the volume of imports from RTT itself was significant in causing material injury to the domestic industry during the period of investigation.[11]  And, if that analysis is substantiated by evidence on the record, the court may not re-weigh that evidence or substitute its analysis for that of the agency.  E.g., USEC, Inc. v. United States, 25 CIT 49, 54, 132 F.Supp.2d 1, 6 (2001), aff'd, 34 Fed.App'x 725 (Fed.Cir. 2002).

Here, it is self-evident from the data compiled in the tables attached to the ITC's determination, and incorporated by reference thereto in the majority's published views, that the commissioners have found more than an adequate basis for them.  See USITC Pub. 3546, pp. 36-38.  See also SAA, p. 892, citing Ceramica Regiomontana, S.A. v. United States, 810 F.2d 1137, 1139 (Fed.Cir.

---

[11] See 19 U.S.C. §1677(7)(C)(i).  Compare Plaintiff's Opening Brief, p. 22:

> . . . The Commission Majority failed to consider whether [RTT']s import volumes or market share, or any growth in those trends over the POI, were independently significant given the dominant presence of other subject and non-subject imports and the trends in such imports.

A "trend" analysis, however, is irrelevant to a finding of current material injury.  See SAA, p. 883 (comparing standards for material injury and threat of such injury).  Instead, it more appropriately applies to a "threat" analysis under 19 U.S.C. §1677(7)(F).  See, e.g., Asociacion de Productores de Salmon y Trucha de Chile AG v. U.S. Int'l Trade Comm'n, 26 CIT 29, 43, 180 F.Supp.2d 1360, 1375 (2002), citing SAA at 885; Bando Chemical Industries, Ltd. v. United States, 16 CIT 133, 135, 784 F.Supp. 224, 225 (1992).

1987), quoting <u>Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc</u>., 419 U.S. 281, 286 (1974):

> . . . Existing law does not require that an agency make an explicit response to every argument made by a party, but instead requires that issues material to the agency's determination be discussed so that the "agency's path [*sic*] may reasonably be discerned" by a reviewing court.

<u>See</u>, <u>e</u>.<u>g</u>., <u>Consolo v. Federal Maritime Comm'n</u>, 383 U.S. 607, 620 (1966); <u>Matsushita Elec. Indus. Co. v. United States</u>, 750 F.2d 927, 933 (Fed.Cir. 1984); <u>Bando Chemical Industries, Ltd. v. United States</u>, 16 CIT 133, 136, 787 F.Supp. 224, 226 (1992) ("it is [] true that a record may support several acceptable alternatives"). The law is well-settled that it is

> within the Commission's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence.

<u>Maine Potato Council v. United States</u>, 9 CIT 293, 300, 613 F.Supp. 1237, 1244 (1985). And that is what occurred here with regard to each of the ITC majority's "significant" findings. <u>See</u> USITC Pub. 3546, pp. 36-38.

The only conclusion the court can extrapolate from the evidence referred to in plaintiff's papers and Chairman Okun's dissenting view is that there may be additional causes of, or reasons for, the domestic industry's material injury. <u>Cf</u>. SAA, p. 885:

>. . . While [other] factors . . . may account for the injury to the domestic industry, they also may demonstrate that an industry is facing difficulties from a variety of sources and is vulnerable to dumped or subsidized imports.

But this does not preclude a determination that the subject imports from Trinidad and Tobago caused material injury to the domestic industry.  See, e.g., Nippon Steel Corp. v. United States, 26 CIT 911, 936 and 223 F.Supp.2d 1349, 1371 n. 31 (2002) ("there may be more than one sufficient cause of material injury"), rev'd on other grounds, 345 F.3d 1379 (Fed.Cir. 2003).  If the court were to accept plaintiff's pressing of Chairman Okun's dissenting view, then the ITC's material-injury analysis with respect to the cumulated subject imports also would be tenuous.  But surely, neither the plaintiff nor the chairman requests reconsideration of that determination.

                                  II

        In view of the foregoing, plaintiff's motion for judgment upon the agency record cannot be granted; and this action should therefore be dismissed.  Judgment will enter accordingly.

        So ordered.

Decided:  New York, New York
          March 22, 2005

                                    Thomas J. Aquilino, Jr.
                                        Senior Judge