**Slip Op. 04-7**

## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS**

_____
                                                          :
TIMKEN U.S. CORPORATION,                                  :
                                                          :
        Plaintiff,                                       :
                                                          :
        v.                                               :
                                                          :
UNITED STATES,                                            :
                                                          :
        Defendant,                                       :
                                                          :
        and                                              :
                                                          :
NSK LTD., NSK-RHP EUROPE LTD.,                            : Court No.
RHP BEARINGS LTD., NSK BEARINGS                           : 00-08-00385
EUROPE LTD. and NSK CORPORATION;                          :
NTN BEARING CORPORATION OF AMERICA,                       :
NTN BOWER CORPORATION, NTN-BCA                            :
CORPORATION and NTN CORPORATION;                          :
SKF USA INC. and SKF GmbH; FAG                            :
KUGELFISCHER GEORG SCHÄFER AG, THE                        :
BARDEN CORPORATION (U.K.) LIMITED,                        :
THE BARDEN CORPORATION,  FAG ITALIA                       :
S.p.A. and FAG BEARINGS CORPORATION;                      :
KOYO SEIKO CO., LTD. and KOYO                             :
CORPORATION OF U.S.A.,                                    :
                                                          :
        Defendant-Intervenors.                           :
                                                          :
_____

Plaintiff, Timken U.S. Corporation, moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging certain aspects of the United States International Trade Commission's ("ITC" or "Commission") final determination in <u>Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom</u>, 65 Fed. Reg. 39,925 (June 28, 2000), in which the ITC found that revocation of the antidumping duty orders (ITC Inv. Nos. 731-TA-391-394, -397 and -399) on cylindrical roller bearings ("CRBs") from France, Germany, Italy, Japan and the United Kingdom "would not be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time." Specifically, Timken challenges the determination with regard to CRBs from France, Germany, Italy, Japan and the United Kingdom and contends,

inter alia, that the ITC failed to: (1) properly assess the importance of foreign affiliations with the domestic industry; (2) adequately consider whether adverse price effects are likely; (3) consider all relevant record evidence including data pertaining to inventory levels, third country pricing and improvements in the domestic CRBs industry; (4) consider the relevant economic factors in the sunset review within the context of the business cycle; and (5) consider the United States Department of Commerce's ("Commerce") determination that dumping would likely recur following revocation of the antidumping duty orders. Timken further challenges certain aspects of Chairman Stephen Koplan and Commissioner Thelma J. Askey's separate views. The complete views of the ITC were published in Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom ("Final Determination"), Inv. Nos. AA1921-143, 731-TA-341, 731-TA-343-345, 731-TA-391-397, and 731-TA-399 (Review), USITC Pub. 3309 (June 2000).


**Held:** Timken's motion for judgment upon the agency record is granted in part and denied in part. Case remanded to the ITC for further explanation and investigation consistent with this opinion.


[Timken's 56.2 motion is granted in part and denied in part. Case remanded.]

January 27, 2004


Stewart and Stewart (Terence P. Stewart, Geert De Prest, Eric P. Salonen and Amy A. Karpel) for Timkem U.S. Corporation, plaintiff.

Lyn M. Schlitt, General Counsel, Office of the General Counsel, United States International Trade Commission (Mark A. Bernstein, Acting Assistant General Counsel, and John D. Henderson), for the United States, defendant.

Crowell & Moring LLP (Robert A. Lipstein, Matthew P. Jaffe and Grace W. Lawson) for NSK Ltd., NSK-RHP Europe Ltd., RHP Bearings Ltd., NSK Bearings Europe Ltd. and NSK Corporation, defendant-intervenors.

Barnes, Richardson & Colburn (Donald J. Unger, Kazumune V. Kano and David G. Forgue) for NTN Bearing Corporation of America, NTN Bower Corporation, NTN-BCA Corporation and NTN Corporation,

defendant-intervenors.

Steptoe & Johnson LLP (Herbert C. Shelley, Alice A. Kipel, David N. Tanenbaum and Mary T. Mitchell) for SKF USA Inc. and SKF GmbH, defendant intervenors.

Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP (Max F. Schutzman, Andrew B Schroth, Mark E. Pardo and Adam M. Dambrov) for FAG Kugelfischer Georg Schäfer AG, The Barden Corporation (U.K.) Limited, The Barden Corporation, FAG Italia S.p.A. and FAG Bearings Corporation, defendant-intervenors.

Sidley Austin Brown & Wood LLP (Neil R. Ellis) for Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A., defendant-intervenors.

## OPINION

**TSOUCALAS**, **Senior Judge:** Plaintiff, Timken U.S. Corporation ("Timken"),[1] moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging certain aspects of the United States International Trade Commission's ("ITC" or "Commission") final determination in Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom, 65 Fed. Reg. 39,925 (June 28, 2000), in which the ITC found that revocation of the antidumping duty orders (ITC Inv. Nos. 731-TA-391-394, -397 and -399) on cylindrical roller bearings ("CRBs") from France, Germany, Italy, Japan, Sweden and the United Kingdom "would not be likely to lead to continuation or recurrence

---

[1]     This action was brought by The Torrington Company that was acquired by The Timken Company on February 18, 2003, and is now known as Timken U.S. Corporation.  The Court refers to plaintiff as Timken U.S. Corporation in the caption and as Timken throughout this opinion.

of material injury to an industry in the United States within a reasonably foreseeable time." Specifically, Timken challenges the determination with regard to CRBs from France, Germany, Italy, Japan and the United Kingdom and contends, inter alia, that the ITC failed to: (1) properly assess the importance of foreign affiliations with the domestic industry; (2) adequately consider whether adverse price effects are likely; (3) consider all relevant record evidence including data pertaining to inventory levels, third country pricing and improvements in the domestic CRBs industry; (4) consider the relevant economic factors in the sunset review within the context of the business cycle; and (5) consider the United States Department of Commerce's ("Commerce") determination that dumping would likely recur following revocation of the antidumping duty orders. Timken further challenges certain aspects of Chairman Stephen Koplan and Commissioner Thelma J. Askey's separate views. The complete views of the ITC were published in Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom ("Final Determination"), Inv. Nos. AA1921-143, 731-TA-341, 731-TA-343-345, 731-TA-391-397, and 731-TA-399 (Review), USITC Pub. 3309 (June 2000).[2]

_____

[2]     During the issuance of this determination, the Commission was comprised of Chairman Koplan, Vice Chairman Okun and Commissioners Bragg, Miller, Hillman and Askey. Vice Chairman Okun, however, did not participate in the review. See Final

## Background

In May 1989 the ITC determined that a domestic industry was likely to be injured as a result of CRBs imported into the United States from certain countries that were likely to be sold at less than fair value ("LTFV"). See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom ("Original Investigation"), Inv. Nos. 303-TA-19 and 20 (Final) and 731-TA-391—399 (Final), USITC Pub. 2185 (May 1989). On May 15, 1989, notices of antidumping duty orders were published in the Federal Register with respect to CRBs imported from various countries, including France, Germany, Italy, Japan and the United Kingdom. See Antidumping Duty Orders on Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings and Parts Thereof From the Federal Republic of Germany, 54 Fed. Reg. 20,900; Antidumping Duty Orders on Ball Bearings, Cylindrical Roller Bearings, Spherical Plain Bearings, and Parts Thereof From France, 54 Fed. Reg. 20,902; Antidumping Duty Orders on Ball Bearings and Cylindrical Roller Bearings, and Parts Thereof From Italy, 54 Fed. Reg. 20,903; Antidumping Duty Orders on Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings, and Parts Thereof From

Determination, USITC Pub. 3309 at 1 n.2.

<u>Japan</u>, 54 Fed. Reg. 20,904; <u>Antidumping Duty Orders and Amendments to the Final Determinations of Sales at Less Than Fair Value on Ball Bearings, and Cylindrical Roller Bearings and Parts Thereof From the United Kingdom</u>, 54 Fed. Reg. 20,910.

On April 1, 1999, the Commission issued notice of its five-year ("sunset") reviews, concerning antidumping duty orders on certain bearings, including CRBs from France, Germany, Italy, Japan and the United Kingdom, to determine whether revocation of the orders would be likely to lead to continuation or recurrence of material injury. <u>See Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom</u>, 64 Fed. Reg. 15,783. On July 2, 1999, the Commission determined that it would conduct full reviews.[3] <u>See Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom</u>, 64 Fed. Reg. 38,471 (July 16, 1999). Notice regarding scheduling a public hearing was published on August 27, 1999, <u>see Certain Bearings from China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom</u>, 64 Fed. Reg. 46,949-50, and the hearing, allowing all interested parties to comment, was held on

---

[3] In a five-year review, the ITC may conduct a full review, which includes a public hearing, issuance of questionnaires and other procedures, or an expedited review not encompassing such procedures. <u>See</u> 19 C.F.R. §§ 207.60(b)-(c) & 207.62(c)-(d) (1999).

March 21, 2000.  <u>See</u> <u>Final Determination</u>, USITC Pub. 3309 at 2.

The Commission made a final determination regarding the effect of revoking the antidumping duty orders on CRBs from France, Germany, Italy, Japan and the United Kingdom in June 2000, and concluded that lifting the orders would not likely lead to continuation or recurrence of material injury to any domestic industry within the reasonably foreseeable future.[4]  <u>See</u> <u>Final Determination</u>, USITC Pub. 3309 at 1-2.  Timken advances several challenges to the Commission's negative determination and contends that the finding was unsupported by substantial evidence or otherwise contrary to law because of its reliance on, <u>inter alia</u>, illogical reasoning,  inconsistent record evidence and incorrect conclusions regarding price underselling and domestic market vulnerability.  <u>See</u> Timken's Br. Supp. R. 56.2 Mot. J. Agency R.

---

[4]      The Commission's views as to CRBs were expressed by Chairman Koplan and Commissioner Hillman.  The Commission voted 4 to 1 in favor of revocation with respect to the United Kingdom and 3 to 2 in favor of revocation with respect to France, Germany, Italy and Japan.  Commissioner Askey concurred with the Commission's findings, but wrote separately and joined in the Commission's discussion of the domestic like product, domestic industry and related parties.  <u>Final Determination</u>, USITC Pub. 3309, <u>Concurring and Dissenting Views of Commissioner Thelma J. Askey</u> ("<u>Askey's Views</u>") at 115.  Commissioner Bragg dissented with the Commission with respect to CRBs from France, Germany, Italy and Japan.  <u>Final Determination</u>, USITC Pub. 3309, <u>Separate and Dissenting Views of Commissioner Lynn M. Bragg</u> at 65. Commissioner Miller dissented with the Commission with respect to CRBs from France, Germany, Italy, Japan and the United Kingdom.  <u>Final Determination</u>, USITC Pub. 3309, <u>Separate and Dissenting Views of Commissioner Marcia E. Miller</u> at 83.

("Timken's Br.") at 1-7.  The ITC and defendant-intervenors, NSK Ltd., NSK-RHP Europe Ltd., RHP Bearings Ltd., NSK Bearings Europe Ltd. and NSK Corporation (collectively "NSK"), NTN Bearing Corporation of America, NTN Bower Corporation, NTN-BCA Corporation and NTN Corporation (collectively "NTN"), SKF USA Inc. and SKF GmbH (collectively "SKF"), and FAG Kugelfischer Georg Schäfer AG, The Barden Corporation (U.K.) Limited, The Barden Corporation, FAG Italia S.p.A. and FAG Bearings Corporation (collectively "FAG"), oppose Timken's claims.  Defendant-intervenors, Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A., did not supply the Court with opposition briefs to Timken's motion for judgment upon the agency record.

## Jurisdiction

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(I) (2000) and 28 U.S.C. § 1581(c) (2000).

## Standard of Review

The Court will uphold the Commission's final determination in a full five-year sunset review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994); see NTN Bearing Corp. of America v. United States, 24 CIT 385, 389-90, 104 F. Supp. 2d 110, 115-16 (2000)(detailing the Court's standard of review for

agency determinations). "'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "[T]he possibility of drawing two inconsistent conclusions from the [same] evidence does not" preclude the Court from holding that the agency finding is supported by substantial evidence. Consolo v. Federal Mar. Comm'n, 383 U.S. 607, 620 (1966). An agency determination will not be "overturned merely because the plaintiff 'is able to produce evidence . . . in support of its own contentions and in opposition to the evidence supporting the agency's determination.'" Torrington Co. v. United States, 14 CIT 507, 514, 745 F. Supp. 718, 723 (1990)(internal citation omitted), aff'd, 938 F.2d 1276 (Fed. Cir. 1991).

## Discussion

### I. Statutory Background

In a five-year review, the ITC determines whether revocation of an antidumping duty order would likely "lead to continuation or recurrence of dumping . . . [and] material injury." 19 U.S.C. § 1675(c)(1) (1994). The Statement of Administrative Action ("SAA")[5]

---

[5]     The SAA represents "an authoritative expression by the Administration concerning its views regarding the interpretation

(continued...)

clarifies that the standard applied to determine whether it is "likely" that material injury will continue or recur is different from the standards applied in material injury or threat of material injury determinations. See H.R. Doc. No. 103-465, at 883 (1994), reprinted in 1994 U.S.C.C.A.N. at 4209. Specifically, "under the likelihood standard, the Commission will engage in a counter-factual analysis: it must decide the likely impact in the reasonably foreseeable future . . . [due to] revocation" of an antidumping duty order. H.R. Doc. No. 103-465, at 883-84, reprinted in 1994 U.S.C.C.A.N. at 4209.

In its 19 U.S.C. § 1675a(a)(1) (1994) determination, the Commission continuously considers "the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked . . . ." Title 19 of the United States Code also states that the Commission shall consider:

> (A) its prior injury determinations, including the volume, price effect, and impact of imports of the subject merchandise on the industry before the order was

_____

(...continued)
and application of the Uruguay Round agreements." H.R. Doc. No. 103-316, at 656 (1994), reprinted in 1994 U.S.C.C.A.N. 4040. "It is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement." Id.; see also 19 U.S.C. § 3512(d) (1994) ("The statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.")

issued . . . ,

> (B) whether any improvement in the state of the industry is related to the order . . . . ,

> (C) whether the industry is vulnerable to material injury if the order is revoked . . . , and

> (D) in an antidumping proceeding under [19 U.S.C. § 1675(c)] . . . , the findings of the administering authority regarding duty absorption under [19 U.S.C. § 1675(a)(4)] . . . .

19 U.S.C. § 1675a(a)(1)(A)-(D). Guidance regarding the basis for the Commission's determination is also provided in 19 U.S.C. § 1675a(a)(5). In pertinent part, the statute reads that:

> [t]he presence or absence of any factor which the Commission is required to consider under [19 U.S.C. § 1675a] shall not necessarily give decisive guidance with respect to the Commission's determination of whether material injury is likely to continue or recur within a reasonably foreseeable time if the order is revoked . . . . In making that determination, the Commission shall consider that the effects of revocation . . . may not be imminent, but may manifest themselves only over a longer period of time.

19 U.S.C. § 1675a(a)(5). The SAA adds that although the Commission must consider all factors listed in 19 U.S.C. § 1675a(a)(1)(A)-(D), "no one factor is necessarily dispositive." H.R. Doc. No. 103-465, at 886, reprinted in 1994 U.S.C.C.A.N. at 4211.

## II.  Commission Findings

In the case at bar, the ITC determined that revocation of the antidumping duty orders on CRBs from France, Germany, Italy, Japan and the United Kingdom ("the subject countries") would not likely

lead to continuation or recurrence of material injury to a domestic industry within a reasonably foreseeable time. See Final Determination, USITC Pub. 3309 at 1-2. To determine whether CRBs from the subject countries would compete with each other and with domestic like products, the ITC generally considers four factors, which include:

> (1) the degree of fungibility between the imports from different countries and between imports and the domestic like product, including consideration of specific customer requirements and other quality related questions; (2) the presence of sales or offers to sell in the same geographical markets of imports from different countries and the domestic like product; (3) the existence of common or similar channels of distribution for imports from different countries and the domestic like product; and (4) whether the imports are simultaneously present in the market.

Id. at 17 n.112 (referencing Wieland Werke, AG v. United States, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989) (stating the factors considered by the ITC in a prior final determination)). However, since sunset reviews are prospective in nature, the ITC also considers additional "significant conditions of competition that are likely to prevail if the orders [on CRBs from the subject countries] are revoked." Final Determination, USITC Pub. 3309 at 17.

### A.   Cumulation

The ITC cumulated subject imports from the subject countries upon specific findings that were based on the available information

regarding the capacity and export orientation of the CRBs industries in France, Germany, Italy, Japan and the United Kingdom.[6] See id. at 43. These findings were: (1) "subject imports from all five countries would be likely to have a discernible adverse impact on the domestic industry if the orders were revoked"; and (2) "a reasonable overlap of competition between the subject imports and the domestic like product is likely to exist if the orders were revoked." Id.

### B.   Conditions of Competition

In the Final Determination, the ITC discusses several conditions of competition in the CRBs market that are unlikely to change in the reasonably foreseeable future. One such condition is that the domestic demand for CRBs has rapidly increased and that the ITC forecasts further growth for the near future. See id. at 45. This increased demand is a result of: (1) a revitalization of the domestic automotive industry; (2) an increase in air travel; (3) an increased demand for products traditionally using CRBs for operation; and (4) the creation of new bearing dependent products. See id. at 46.

The second condition considered by the ITC is that there will be a continued increase in demand for customized CRBs created by

---

[6]      The ITC's findings on cumulation are not at issue in this case.

the automotive industry.  See id. at 46-47.  The third condition is that Timken, the dominant domestic producer, will continue to increase its production capacity throughout the period of review ("POR").  Finally, the ITC acknowledges that "CRBs are typically produced on dedicated machinery, and it is difficult and expensive to shift production lines from one type of bearing to another." Id. at 47 (citation omitted).

### C.    Revocation of the Orders on CRBs from the Subject Countries

#### 1.    Likely Volume of Subject Imports

The ITC determined that any increase of the volume of subject imports that may result from the revocation of the antidumping duty orders is not likely to be significant due to the strong and growing demand for CRBs and the strength of the domestic industry. See id. at 48.  This determination is based, in large part, on the fact that "most of the major subject producers are related to domestic producers, either through direct ownership or through a common parent company.  The record indicates that foreign producers have a strong and long-standing interest in U.S. production, and that this commitment is unlikely to change in the reasonably foreseeable future."  Id.  (citation omitted).

## 2. Likely Price Effects of Subject Imports

Based on record evidence, the ITC further concluded that it is unlikely that subject imports will have significant price effects on the domestic industry in the event that the orders are revoked. According to the ITC, most of the subject producers are related to domestic producers, therefore making it unlikely that any subject producer will engage in pricing behavior that would be injurious to its domestic affiliated producer. See id. at 49. Moreover, since the CRBs market is highly customized, the importance of non-price factors, such as "the ability to provide technical support and high delivery reliability," make price a lesser concern in purchasing decisions. Id.

## 3. Likely Impact of Subject Imports

In the Final Determination, the ITC also found an improvement in the domestic CRBs industry since the antidumping duty orders were imposed and concluded that the United States industry is not currently vulnerable. See id. at 50. Specifically, the Commission found:

> The CRB[s] industry was clearly ailing during the period of the original investigation, with low or negative income and anemic capacity utilization. The years since the imposition of the orders have brought a dramatic expansion of the industry overall. . . . The number of production workers rose from 1,900 in 1987 to 4,160 in 1998. The ratio of operating income to net sales rose from 1.4 percent in 1987 to a very healthy 13.9 percent in 1998. Domestic producers have even increased exports relative to the period of the original investigations.

By any measure, the domestic CRB[s] industry is significantly stronger now than it was during the period of the original investigations and is not currently vulnerable to material injury.

Id. at 50 (citations omitted).


## III. Analysis

### A. The Affiliations Between Domestic Producers and Subject Foreign Producers

#### 1. Contentions of the Parties

In its moving brief, Timken contends that the Commission erred in determining that increases in import volume or adverse price effects were not likely because some domestic producers were related to some subject foreign exporters. See Timken's Br. at 37-47. Specifically, the ITC found that certain domestic CRBs producers were owned by producers domiciled in four subject countries. See id. at 37. Timken takes issue with the ITC's conclusion that "increases in import volume were unlikely[] because the subject foreign producers could be expected to avoid increases in import volume which would harm their own affiliates in the United States." Id. at 37-38. Timken begins its argument by presenting a syllogism, on which it claims the Commission's Final Determination was based, and finds error in the syllogism's conclusion that subject producers will not increase imports in

order to protect their domestic interests.[7]  See Timken's Br. at
40-44.  Timken also argues that the ITC erred by failing to
adequately explain how it reached its determination regarding
affiliated producers.  See id. at 43.  Moreover, Timken complains
that the ITC violated the antidumping statute by failing to examine
the likely import volume and price effects in the context of the
domestic industry as a whole.  See id. at 43-44.  According to
Timken, since the ITC failed to exclude

> any related parties from the domestic industry database,
> the domestic industry as [a] whole comprised the
> affiliates of all foreign producers and all U.S. owned
> producers. . . .  Without an examination of the likely
> competitive behavior of foreign producers towards the
> U.S. affiliates of other foreign producers and U.S.-owned
> producers, the Commission has not complied with [19
> U.S.C. § 1677(4) (1994)].

---

[7]  The Court does not agree that the syllogism presented by
Timken accurately reflects the reasoning of the agency.  The ITC
considered the presence of multinational CRBs producers in the
United States a factor that indicates that subject producers are
unlikely to increase the volume of subject imports in order to
protect their domestic affiliations.  Specifically, the ITC found
that the CRBs market is dominated by several global producers with
facilities in various markets, including the United States.  See
Final Determination, USITC Pub. 3309 at 47.  These producers
accounted for a substantial percentage of domestic CRBs shipments
measured by cumulated production of the subject merchandise in
1998.  See id.  The ITC further found that "expansion of overseas
facilities by these multinational companies reflects in part a
trend to localize production facilities in response to customers'
needs."  Def. ITC's Opp. Timken's Mot. J. Agency R. ("ITC's Opp'n")
at 13 (emphasis added).  However, the ITC did not base its volume
determination on this factor alone.  The Commission also considered
the current strength of the domestic CRBs industry and the growing
demand for CRBs and customized CRBs in the domestic industry.  See
Final Determination, USITC Pub. 3309 at 46-47.

Id. at 43 (emphasis in original).

Timken further argues that the ITC has no precedent to base its negative determination that some domestic producers had affiliations with the subject companies. See id. at 44. According to Timken, in at least sixty-three prior reviews, the ITC did not consider the impact of foreign investment by a subject producer in reaching its final determination.[8] See id. at 44-45. Timken specifically cites Gray Portland Cement and Cement Clinker From Japan, Mexico, and Venezuela ("Gray Portland Cement"), Inv. Nos. 303-TA-21 (Review) and 731-TA-451, 461, and 519 (Review), USITC Pub. 3361 (Oct. 2000), where the Commission found "injurious import volume and price effects were likely even though 60% of the domestic production was foreign owned." Timken's Br. at 45 (emphasis in original).

Timken also points out that the ITC's determination is inconsistent with its prior findings with regard to the CRBs industry. See id. at 46-47. According to Timken, in the original

---

[8] Timken distinguishes 12-Volt Motorcycle Batteries From Taiwan, Inv. No. 731-TA-238 (Final), USITC Pub. 2213 (Aug. 1989), where the ITC found it is reasonable to infer that one company, which dominated the domestic industry and was owned by a Japanese parent company that was also parent company to the competing foreign producer, was not threatened with material injury by foreign imports from the same foreign producer. See Timken's Br. at 44 n.68. (citation omitted); see also 12-Volt Motorcycle Batteries From Taiwan, 54 Fed. Reg. 35,089 (Aug. 23, 1989).

investigation, the ITC found that eight United States CRBs producers were foreign owned.  However, the Commission still determined that "'there is no evidence that such producers are 'shielded' from the impact of unfairly traded imports.'" Id. at 47 (citing Original Investigation, USITC Pub. 2185 at A-62).  This finding was made despite the fact that foreign owned producers experienced "significant operating losses during the first two years of the original investigation period." Id.

The ITC rejects Timken's arguments regarding affiliations between foreign producers and domestic producers of CRBs.  See Def.'s Opp'n at 12.  The Commission found that the CRBs market is dominated by several global producers with affiliations in the domestic market.  See id.  Commissioner Askey made "comparable findings that these affiliations would be a disincentive for producers of subject merchandise to increase exports to the United States or engage in pricing behavior that would be injurious to the domestic industry." Id. at 14; see Askey's Views, USITC Pub. 3309 at 151-53.

The ITC also claims that Timken's arguments regarding possible incentives that would lead the subject producers to increase export volumes ignores the conditions of competition identified by the Commission in the Final Determination. See Def.'s Opp'n at 14-15.  According to the ITC:

the Commission found that the expansion of such affiliations was part of a global trend among the large multinational producers to localize production facilities in response to customer's needs. This incentive to serve customers with localized production facilities in the United States would remain regardless of whether the antidumping orders were revoked, particularly given the importance U.S. purchasers attach to such non-price factors as technical support and high delivery reliability.

Moreover, the foreign producers' significant investment in their U.S. affiliates to add production capacity creates a further disincentive to undercut their affiliates. The Commission found that the CRB[s] industry is capital-intensive and must operate at high capacity utilization rates to be profitable. It additionally found that it is difficult for CRB[s] producers to shift from producing one type of bearing to another, and difficult for U.S. producers to shift sales to markets outside the United States.

Id. at 15-16 (citations and footnotes omitted). The ITC argues that Timken fails to provide any credible explanation of the incentive of foreign producers to engage in activity harmful to their domestic affiliates. See id. at 16. In addition, the ITC contends that even large Japanese CRBs producers, without domestic affiliates, are unlikely to engage in injurious activities because "'[t]he industry in Japan is heavily oriented towards its home market.'" Id. at 17 (citation omitted). Finally, the ITC rejects Timken's argument that the Commission failed to consider the domestic industry as a whole, and focused only on foreign producers' investments in domestic affiliates. See id. at 16-18.

NSK, NTN, SKF and FAG generally support the arguments espoused by the ITC. NSK adds that neither the antidumping statute nor its legislative history require the Commission to "address each factor or piece of evidence it considered" in a sunset review determination. Resp. Br. Opp'n Timken's Mot. J. Agency R. ("NSK's Resp.") at 13 (emphasis omitted). NTN also clarifies that the record indicates that five, and not four, domestic CRBs producers are owned by CRBs producers that are domiciled abroad. Resp. NTN Timken's Jan. 22, 2001 Br. Supp. Mot. J. Agency R. at 9. NTN considers this fact additional evidence that supports a finding that the Final Determination is supported by substantial evidence. See id.

### 2. Analysis

Timken argues that since foreign affiliations with the domestic industry was not a relevant factor in the Commission's original determination or in sixty-three prior antidumping cases, the ITC's current determination is illogical, unsupported by substantial evidence and otherwise contrary to law. See Timken's Br. at 37-47. The Court agrees with Timken that it is anomalous to consider foreign investment in the domestic industry as a relevant factor in the determination under review, while failing to consider the same factor in the original investigation. It is important to note, however, that the ITC's Final Determination was not dependent

on one single factor, namely, affiliations between foreign and domestic CRBs producers, but rather considered various other conditions. See Final Determination, USITC Pub. 3309 at 45-49 (discussing, inter alia, the general increase in demand for CRBs, increases in domestic shipments of CRBs in the United States and abroad, and the high demand for customized CRBs). Moreover, the SAA explains that the standard applied to determine whether it is "likely" that material injury will continue or recur, applicable in sunset reviews, is different from the standards applied in material injury or threat of material injury determinations, applicable in original investigations. See H.R. Doc. 103-465, at 883, reprinted in 1994 U.S.C.C.A.N. at 4209. The SAA explains that in a five-year review, the Commission "engage[s] in a counter-factual analysis" to determine the likely impact of revocation "in the reasonably foreseeable future of an important change in the status quo . . . ." Id. at 884. Similar to other reviews discussed by Timken, the Commission weighed all of the evidence before it and reasonably concluded that the subject producers presently lack incentive to increase imports of subject merchandise in the reasonably foreseeable future. The ITC based its volume and price findings, in part, on

> the Commission's analysis of the economic incentives arising out of the relationships of producers of subject merchandise with their domestic affiliates, incentives that would likely affect their behavior toward the entire domestic industry, including the domestic producers with

which they [are] not affiliated.
Def.'s Opp'n at 18.

Legislative intent makes clear that "a reviewing court is not barred from setting aside [an agency] decision when it cannot conscientiously find that the evidence supporting that decision is substantial, <u>when viewed in the light that the record in its entirety furnishes</u>, including the body of evidence opposed to the [agency's] view." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951) (emphasis added). <u>See, e.g.</u>, <u>Gerald Metals, Inc. v. United States</u>, 132 F.3d 716, 720 (Fed. Cir. 1997) (clarifying the standard of review for ITC determinations). Therefore, it was reasonable for the Commission to review the entire administrative record and consider affiliations between domestic producers and subject foreign CRBs producers a factor in its five-year review. However, Timken is correct in its assertion that the <u>Final Determination</u> fails to adequately examine the likely competitive behavior of foreign producers towards the domestic affiliates unrelated to the subject importers. Since 19 U.S.C. § 1675a(a)(4) explicitly directs the Commission to evaluate "the likely impact of imports of the subject merchandise on the [domestic] industry," the Court remands the <u>Final Determination</u> for further explanation of the likely import volume and price effects in the context of the domestic industry as a whole.

B.  **The Commission's Finding that Concentration in the Domestic CRBs Industry Will Prevent Injurious Price Effects**

1.  **Contentions of the Parties**

Timken argues that the Commission fails to adequately explain the connection between foreign producers' concentration in the domestic industry and the conclusion that adverse price effects are not likely. See Timken's Br. at 49. Moreover, Timken contends that "there is no support in the record that the number of producers or the relative market share of any one producer had any impact whatsoever on competition generally, or on prices specifically, so as to be able to prevent adverse price effects from occurring." Id. (emphasis in original omitted). Timken also claims that the ITC's price effects finding is completely inconsistent with past precedent. See id. at 50-51. Timken concludes its argument by citing certain record evidence that Timken claims supports the conclusion that injurious price effects are likely in the event of revocation. See id. at 53-58.

The ITC argues that the Commission relied on several factors in concluding that revocation would unlikely lead to significant price effects. See Def.'s Opp'n at 23. Such factors include: (1) CRBs were frequently customized to some extent for particular purchasers; (2) consumers of CRBs greatly relied on non-pricing factors in deciding what CRBs to purchase; (3) most of the subject

producers were affiliated with producers of the domestic like products; and (4) the pricing data collected by the Commission proved to be inconclusive to make an affirmative injury determination. See id. The ITC also attacks Timken's arguments regarding likely price effects by stating that Timken almost exclusively focuses on the Commission's discussion of industry concentration and disregards the other aspects of the Commission's pricing analysis. See id.

NSK, NTN, SKF and FAG generally support the arguments presented by the ITC. NSK adds that the Commission found the CRBs market to be inelastic and, therefore, generally not affected by fluctuations in price. See NSK's Resp. at 21. NSK further argues that since CRBs are usually manufactured for highly specialized uses, substituting a producer is very difficult and, therefore, highly unlikely. See id. at 22.

### 2. Analysis

The United States Code directs the ITC to conduct a sunset review five years after the publication of an antidumping duty order or a prior sunset review. See 19 U.S.C. § 1675(c)(1). In a sunset review, the ITC determines "whether revocation of an order . . . would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time." 19 U.S.C. § 1675a(a)(1). Such a determination takes into account the likely

volume, price effect and impact of the subject imports if the order were revoked.  See id.

In evaluating the likely price effects of subject imports, the Commission is directed to consider whether:

> (A) there is likely to be significant price underselling by imports of the subject merchandise as compared to domestic like products, and

> (B) imports of the subject merchandise are likely to enter the United States at prices that otherwise would have a significant depressing or suppressing effect on the price of domestic like products.

19 U.S.C. § 1675a(a)(3)(A)-(B).  In the Final Determination, the ITC based its negative price effects conclusion on limited pricing data.  See Final Determination, USITC Pub. 3309 at 49.  This data showed "no clear pattern" of injurious behavior from the subject producers.  See id.  However, based on additional non-price record evidence, the ITC made the determination that the subject producers would not engage in any pricing behavior that would injure their domestic affiliates.  See id.  In the Final Determination and its brief opposing Timken's 56.2 motion, the ITC emphasized the importance of these non-price related factors that influence the CRBs market, including the ability of a producer to provide technical support and high delivery reliability.  See Def.'s Opp'n at 15; Final Determination, USITC Pub. 3309 at 49.

In its pricing determination, the ITC considered the effects of domestic industry concentration "not as an independent factor indicating that revocation of the order would not have significant price effects, but rather only as relevant to the question of whether producers of subject merchandise would engage in pricing behavior that would injure their domestic affiliates."  Def.'s Opp'n at 25.  In attacking the ITC's price effects analysis, Timken merely isolates the ITC's analysis on industry concentration, and fails to consider the additional findings relied on by the Commission in making its negative price effects determination.  One such finding is that quality and not price is the most important factor when determining whether to purchase particular CRBs.  See Final Determination, USITC Pub. 3309 at 49.  Accordingly, the Court upholds the Commission's determination that, among other factors, concentration in the domestic CRBs industry by the subject producers makes it unlikely that revocation of the antidumping duty orders will result in adverse price effects.

## C.   The Commission's Consideration of Relevant Record Evidence

### 1.    Contentions of the Parties

In its moving brief, Timken maintains that the Commission failed to address critical evidence regarding inventory levels, third country prices and likely dumping margins.  See Timken's Br.

at 59. According to Timken, the ITC's own report "showed U.S. importers' inventories of subject imports at substantial and rising levels," which supports a likely increased volume determination. Id. at 61. Timken also argues that the data collected from foreign producers' inventories of CRBs also supports a similar volume determination. See id. at 62. Therefore, Timken maintains that the Commission's failure to adequately address inventory levels renders the Final Determination unsupported by substantial evidence.

Timken raises a similar argument with respect to third country prices and likely dumping margins. Although the ITC possessed evidence that "prices in the United States were higher than in third countries" and predictions by Commerce of high post-revocation margins, the Commission failed to discuss these factors in its pricing analysis. See id. at 65-66.

The ITC acknowledges that "existing inventories of subject merchandise or likely increases in inventories are factors that the Commission is to consider" in the pricing analysis of its sunset review determination. Def.'s Opp'n at 29. Therefore, the ITC collected information relating to both importers and foreign producers' inventories of subject CRBs. See id. According to the ITC, this information painted a "mixed picture" that the Commission could not reasonably rely on for its Final Determination. See id.

at 30.  The ITC notes, however, that it did consider such inventories in its determination.  See id. at 30-31.  The ITC also argues that although it collected and considered data relating to dumping margins calculated by Commerce, the antidumping statute does not obligate the Commission to do so.  See id. at 31. Moreover, the ITC argues that it is under no statutory directive to consider pricing data of third countries, much less address such evidence in its determination.  See id. at 33.

NSK, NTN, SKF and FAG consider Timken's arguments unconvincing and argue that the ITC's Final Determination should be upheld.

### 2.   Analysis

"[T]he question of whether the ITC conduc[ted] a thorough . . . investigation begins with the substantial evidence test, and the question of whether, in light of the record evidence as a whole, 'it would have been possible . . .'" for the Commission to have reasonably reached its final determination. Acciai Speciali Terni S.p.A. v. United States, 24 CIT 1064, 1074, 118 F. Supp. 2d 1298, 1307 (citing Allentown Mack Sales & Serv., Inc. v. NLRB., 522 U.S. 359, 366-67 (1998)).  Regardless of whether each piece of specific evidence is discussed, "[t]he [Commission] is presumed to have considered all the evidence in the record." Dastech Int'l, Inc. v. United States, 21 CIT 469, 475, 963 F. Supp. 1220, 1226 (1997); see Roses, Inc. v. United States, 13 CIT 662, 668, 720 F. Supp. 180,

185 (1989); <u>Granges Metallverken AB v. United States</u>, 13 CIT 471, 479, 716 F. Supp. 17, 24 (1989); <u>National Ass'n of Mirror Mfrs. v. United States</u>, 12 CIT 771, 779, 696 F. Supp. 642, 648 (1988). Moreover, "the fact that certain information is not discussed in a Commission determination does not establish that the Commission failed to consider that information because there is no statutory requirement that the Commission respond to each piece of evidence presented by the parties." <u>Granges</u>, 13 CIT at 478-79, 716 F. Supp. at 24 (citations omitted). Although the Commission did not explicitly reference each piece of evidence it examined, the Court is satisfied that it considered all the relevant data in rendering the <u>Final Determination</u>.

In accordance with 19 U.S.C. § 1675a(2)(B), the Commission "collected information relating to inventories of subject merchandise, both with respect to inventories of importers and of foreign producers." Def.'s Opp'n at 29. However, the information collected for domestic importers and foreign producers showed mixed trends, which ultimately prompted the Commission to reject this factor from its volume analysis. <u>See</u> <u>id.</u> at 30; <u>see also</u> <u>Taiwan Semiconductor Indus. Ass'n v. United States</u>, 24 CIT 914, 928, 118 F. Supp. 2d 1250, 1262 (2000) (finding that the ITC has the discretion to weigh evidence in an investigation and choose to weigh some pieces of evidence differently than others). Similarly,

the Commission collected and reviewed information relating to sunset dumping margins determined by Commerce. Unlike an original antidumping investigation, the Commission is not obligated to consider such dumping margins in a sunset review determination. See 19 U.S.C. § 1675a(a)(6) (stating that in making a sunset review determination "the Commission may consider the magnitude of the margin of dumping" (emphasis added)). Contra 19 U.S.C. § 1677(7)(C)(iii) (1994) (stating that the Commission shall evaluate the magnitude of the dumping margin in an original investigation). Moreover, the Commission is not obligated to collect or consider pricing information in countries other than the United States. See 19 U.S.C. § 1675a(a)(2)-(3). Accordingly, the Court finds that Timken's argument that Commerce failed to address critical evidence regarding inventory levels, third country prices and likely dumping margins is without merit.

**D.    Likely Subject Import Analysis and the Business Cycle Requirement**

**1.    Contentions of the Parties**

Timken argues that the Commission's findings regarding vulnerability of the domestic market and the likely continuation of material injury in the event of revocation are not supported by substantial evidence. See Timken's Br. at 80. According to Timken, the Commission failed to examine the relevant economic

information in the context of the business cycle.  Specifically,
Timken contends that "[n]either in its analysis of the impact of
revocation nor in its discussion of the prevailing conditions of
competition, does the Commission examine the relevant economic
evidence taking into account how this data may be affected by any
cyclical conditions in the industry."  Id. at 80.  Timken
references the ITC's analysis in Gray Portland Cement, USITC Pub.
3361, where the Commission specifically addressed such factors in
the context of the business cycle.

Timken argues that the ITC also failed to consider the
beneficial effects of the original antidumping duty orders on the
domestic industry.  See Timken's Br. at 75.  Specifically, Timken
contends that "[i]n concluding that revocation would not lead to
recurrence of material injury, the Commission cited the 'dramatic
improvement' in the domestic industry since imposition of the order
and concluded that any increases in imports or adverse price
effects would not have a material impact on this 'condition.'"  Id.
at 76.  Timken also attacks Commissioner Askey's analysis and
maintains that her  reasoning directly conflicts with Congressional
intent and is inconsistent with past precedent.  See id. at 76-77.

The ITC contends that its likely subject import determination
is supported by substantial evidence and in accordance with law.

> In concluding that the cumulated subject imports would not be likely to have a material impact on the domestic industry if the antidumping orders on CRBs were revoked, the Commission found that the industry was not vulnerable to material injury. It contrasted the domestic industry's current expanded capacity, 80 percent capacity utilization rates, and 'very healthy' operating ratios with its 'anemic' condition at the time of the original investigation. It observed that these improvements came during a period when, notwithstanding the orders, both subject imports and non[-]subject imports continued to increase substantially both in total value and market share.

Def.'s Opp'n at 34. Moreover, the ITC notes that it had previously found "that revocation of the orders was not likely to result in significant increases in import volumes or significant price effects." Id. Consequently, this determination led the Commission to conclude that "any growth in subject import volumes would not be likely to have a [significant] material impact on the domestic CRB industry's condition." Id. Furthermore, the Commission found that "projected growth in demand for CRBs would likely increase opportunities for the domestic industry even if subject imports were to increase modestly." Id.

The ITC also argues that the Commission properly considered whether improvement in the condition of the domestic industry was attributable to the imposition of the antidumping duty orders. See id. at 35. According to the Commission, the domestic industry was significantly stronger during the POR in comparison to the time period before the imposition of the orders. See id. The

Commission found expanded capacity utilization rates, increased ratios of operating income to net sales and a higher value of United States shipments. See id. This information led the Commission to conclude that "the [domestic] industry's condition was strong and that it was not vulnerable to material injury." Id.

NSK, NTN, SKF and FAG generally argue that the ITC sufficiently addressed whether improvements observed in the CRBs industry were attributable to the antidumping duty orders and properly evaluated all relevant economic factors within the context of the business cycle. Accordingly, the subject producers argue that the Commission's Final Determination should be sustained.

## 2. Analysis

In five-year reviews, the antidumping statute directs Commerce to revoke "an antidumping duty order or finding, . . . unless . . . the Commission makes a determination that material injury would be likely to continue or recur as described in [19 U.S.C. § 1675a(a)] . . . ." 19 U.S.C. § 1675(d)(2). To determine whether revocation is likely to lead to the continuation or recurrence of material injury, 19 U.S.C. § 1675a(a)(1)(B) and (C) instructs the Commission to consider the current state of the domestic industry. Moreover, the antidumping statute provides a list of relevant economic factors that the Commission is to consider in determining the likely impact of imports after revocation. The list includes,

but is not limited to:

> (A) likely declines in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

> (B) likely negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment, and

> (C) likely negative effects on the existing development and production efforts of the industry, including efforts to develop a derivative or more advanced version of the domestic like product.

19 U.S.C. § 1675a(a)(4).  The statute also clarifies that "[t]he Commission shall evaluate all relevant economic factors . . . within the context of the business cycle and the conditions of competition that are distinctive to the affected industry."  Id. (emphasis added).

The Commission "shall [also] take into account . . . whether any improvement in the state of the industry is related to the [antidumping duty] order . . . ."  19 U.S.C. § 1675a(a)(1)(B). Legislative history directs the Commission to

> consider whether there has been any improvement in the state of the domestic industry that is related to the imposition of the order . . . .  The Commission should not determine that there is no likelihood of continuation or recurrence of injury simply because the industry has recovered after the imposition of an order . . . because one would expect that the imposition of an order . . . would have some beneficial effect on the industry. Moreover, an improvement in the state of the industry related to an order . . . may suggest that the state of the industry is likely to deteriorate if the order is revoked . . . .

H.R. Doc. No. 103-465, at 884, reprinted in 1994 U.S.C.C.A.N. at

4210-11.  Title 19 of the United States Code further provides:

> The presence or absence of any factor which the
> Commission is required to consider under [19 U.S.C. §
> 1675a(a)] shall not necessarily give decisive guidance
> with respect to the Commission's determination of whether
> material injury is likely to continue or recur within a
> reasonably foreseeable time if the order is revoked . .
> . .  In making that determination, the Commission shall
> consider that the effects of revocation . . . may not be
> imminent, but may manifest themselves only over a longer
> period of time.

19 U.S.C. § 1675a(a)(5).


In making its Final Determination, the Commission considered

the dramatic increases in United States consumption of CRBs.  See

Final Determination, USITC Pub. 3309 at 45.  Specifically, the ITC

noted the substantial increase in the value of domestic shipments

by United States producers.  See id. at 46.  The Commission

reasoned that such increases were a result, in large part, to the

revitalization of the domestic automotive industry and the gradual

incline in air travel, which both resulted in a subsequent increase

in demand for CRBs.  In making its Final Determination, the ITC

also considered the state of the domestic industry and noted

significant improvements in factors such as capacity, capacity

utilization, number of production workers and ratio of operating

income to net sales.  See Final Determination, USITC Pub. at 50.

Specifically, in its likely subject imports analysis, the ITC

observed that

> [t]he years since the imposition of the orders have
> brought a dramatic expansion of the industry overall.
> Capacity [significantly ]expanded from . . . 1987 to . .
> . 1998.  The growth in capacity was spurred by investment
> by both domestically owned and foreign-owned firms.
> Capacity utilization, which was below 25 percent during
> the period of the original investigation, was over 80
> percent in 1997 and 1998.  The number of production
> workers rose from 1,900 in 1987 to 4,160 in 1998.  The
> ratio of operating income to net sales rose from 1.4
> percent in 1987 to a very healthy 13.9 percent in 1998.
> Domestic producers have even increased exports relative
> to the period of the original investigations.  By any
> measure, the domestic CRB[s] industry is significantly
> stronger now than it was during the period of the
> original investigations and is not currently vulnerable
> to material injury.

Id. (footnotes and confidential information omitted).  In the same

analysis, the ITC noted that such "dramatic improvement in the

health of the domestic industry has occurred during a time when,

despite the orders, subject imports, as well as non[-]subject

imports, continued to increase substantially, both in total value

and in market share."  Id.  The ITC argues that this analysis

adequately addresses whether improvements in the domestic CRBs

industry were attributable to the antidumping duty orders.  The

Court disagrees.  As noted by Timken, the Commission's comparison

of industry indicators over the 1987-1998 period simply describes

the improvements in the domestic industry.  See Timken's Reply Br.

at 38.  Therefore, the Court remands the Final Determination for

further explanation of whether any improvement in the state of the

domestic industry is related to the antidumping duty orders.

The antidumping statute also directs that the Commission's findings must consider all relevant economic factors "<u>within the context of the business cycle</u> and the conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1675a(a)(4) (emphasis added). The purpose of the business cycle requirement is to allow the Commission to consider whether different trends in the business cycle mask harm caused by unfair trading practices. <u>See</u> S. Rep. No. 100-71, 100th Cong., 1st Sess. 115-30 (1987); <u>Chr. Bjelland Seafoods A/S v. United States</u>, 16 CIT 945, 955-56 (1992) (citations omitted). The ITC argues that the Commission "devoted over two pages of . . . its opinion concerning CRBs to a discussion of pertinent conditions of competition in that industry," and that Timken simply disagrees with the Commission's findings as to domestic demand and the condition of the domestic industry. Def.'s Opp'n at 37. The Court, however, finds that the Commission's analysis fails to evaluate all of the relevant economic factors within the context of the business cycle. Accordingly, the Court remands the ITC's <u>Final Determination</u> for further explanation of the Commission's findings in the context of the appropriate business cycle.

**E.    Commissioner Askey's Separate Views Regarding Capacity Utilization Rates**

**1.    Contentions of the Parties**

Timken argues that Commissioner Askey's determination that capacity utilization rates for Germany and Japan are high is directly at odds with the record and, therefore, is unsupported by the record.[9]  See Timken's Br. at 85-88.  Timken also raises issue with Commissioner Askey's finding that German and Japanese utilization rates are at a level sufficient to permit high levels of profitability.  See id. at 87.  Specifically, Timken contends that Commissioner Askey fails to consistently apply a standard capacity utilization rate threshold that would indicate a high profitability level.  See id.

The ITC argues that since the Commission did not consider whether the capacity utilization rates were high in the original investigation, Commissioner Askey was not obligated to consider those rates as dispositive in the sunset review determination.  See Def.'s Opp'n at 40.  According to the ITC, Timken's "argument is based on semantics rather than substance."  Id.  The ITC considers Commissioner Askey's analysis accurate since the subject countries all had capacity utilization rates either exceeding or relatively

---

[9]    Timken also points out that Commissioner Askey's high capacity utilization finding was inconsistent with Commissioners Hillman and Koplan's determination.  See Timken's Br. at 86 n.90.

close to the threshold rate. See id. at 41. The ITC further argues that even a finding that Commissioner Askey's analysis of capacity utilization is flawed and would not alone render the Final Determination unsupported by substantial evidence. See id.

NSK, NTN, SKF and FAG generally agree that Timken's argument relating to Commissioner Askey's capacity utilization finding should be rejected in full. According to NSK, Commissioner Askey did not rely solely on capacity utilization in determining that she concurred with the majority as to revocation of the CRBs orders, but rather, based her decision on a number of unrelated economic factors. See NSK's Resp. at 41-42.

### 2. Analysis

Commissioner Aksey clearly sets out each factor that she considered in her finding that the likely volume of subject imports would not be significant upon revocation of the antidumping duty orders on CRBs. See Askey's View, USITC Pub. 3309 at 149-53. Such factors include the following: (1) antidumping duty orders had little impact on the ability of the subject producers to ship volumes to the United States, as shown by the increased volume and market share of subject imports; (2) the subject producers operated at relatively high capacity utilization rates; (3) subject producer's orientation towards their home markets made it unlikely that they would increase shipments to the United States; (4)

affiliations between subject producers and domestic producers acted as disincentives to subject producers to increase exports to the United States; (5) likely increases in demand mitigated the significance of any increase in volume after revocation of the orders; and (6) inventory levels of the subject producers were not particularly high. See id. Although the Court agrees that it was inaccurate for Commissioner Askey to generalize that all subject producers operate at relatively high capacity utilization rates, the Court finds that Commissioner Askey's reasoning, on a whole, substantiates her negative injury determination. Capacity utilization rates amounted to only one factor that was considered in her determination and, therefore, the Court finds that Commissioner Askey's volume of subject imports findings are supported by substantial evidence.

### F.   Chairman Koplan's Determination With Respect to CRBs from France

#### 1. Contentions of the Parties[10]

Timken argues that the ITC failed to apply adverse inferences with respect to CRBs from France despite the fact that only one foreign subject producer responded to the Commission's requests for data. See Timken's Br. at 88. Timken claims that this approach is contrary to that taken by Chairman Koplan in his analysis of

---

[10]    NSK, NTN and SKF do not address this issue.

spherical plain bearings ("SPBs").  See id. at 88-89.  Timken also argues that Chairman Koplan "attempted to downplay the relevance of the missing data by noting that the 'vast majority of current subject imports' were from the other cumulated countries."  Id. at 91.  In sum, Timken contends that the Final Determination should be remanded with instructions that Chairman Koplan apply adverse inferences with respect to missing production and capacity data. See id. at 93.

The ITC asserts that Timken erroneously characterizes Chairman Koplan's methodology in its SPBs analysis.  See Def.'s Opp'n at 41. The ITC explains that unlike the CRBs analysis, Chairman Koplan did not cumulate subject imports from France with subject imports from Germany and Japan in his SPBs investigation.  Therefore, when determining the price effects and impact of subject imports from France, Chairman Koplan based the Commission's analysis on facts available.  See id. at 42.  The ITC distinguishes that in the CRBs investigation, the Commission (including Chairman Koplan) found that data issues with respect to French producers were not as important in the cumulated CRBs analysis.  This led the Commission to conclude that data collected from the remaining four subject countries "accounted for the vast majority of current subject imports, and that it was 'not . . . likely that the missing data on producers in France would lead [the Commission] to a different

conclusion regarding cumulated subject imports.'"  Id. (citing Final Determination, USITC Pub. 3309 at 48 n.371).

FAG argues that the antidumping statute grants the Commission the discretion to make adverse inferences.  See FAG's Resp. Br. Opp'n Pl.'s R. 56.2 Mot. J. Agency R. at 15.  FAG further argues that the Commission's determination in the SPBs investigation is irrelevant.  See id. at 16.

### 2.  Analysis

Section 1677e of Title 19 of the United States Code states that the Commission "may use an inference that is adverse to the interests of [a] party" that "has failed to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. § 1677e(b) (1994).  Neither the statute's plain language nor its legislative history obligates the Commission to make adverse inferences in any situation.  Rather, the ITC is given the discretion to make such inferences.  Furthermore, the Commission is not required to make identical determinations in every review (i.e., the Commission's SPBs and CRBs investigations), but rather must consider each subject import and the circumstances of each investigation as sui generis.  See Armstrong Bros. Tool Co. v. United States, 84 Cust. Ct. 102, 115, 489 F. Supp. 269, 279 (1980); see also Citrosuco Paulista, S.A. v. United States, 12 CIT

1196, 1209, 704 F. Supp. 1075, 1087 (1988). Therefore, even if the Commission applied adverse inferences in its SPBs investigation, the Commission was certainly not required to do the same in its CRBs analysis.

The Court is satisfied with the Commission's explanation of why it chose not to make adverse inferences against CRBs producers from France and finds that Chairman Koplan's decision was in accordance with law.

## CONCLUSION

The Court remands the Final Determination to the ITC to: (a) further explain any likely impact of CRBs imports from the subject countries in the context of the entire United States CRBs industry; (b) address whether any improvement in the state of the domestic industry is related to the antidumping duty orders; and (c) further explain the Commission's findings in the context of the CRBs business cycle.

**/s/ Nicholas Tsoucalas**
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:    New York, New York
          January 27, 2004